288 F.2d 665
 Murray FERGUSON, as Trustee in Reorganization of Equitable
Plan Company, Plaintiff-Appellee,
v.
Fred TABAH, Louis A. Schnider, Sol R. Kurlander, Clayville
Truck Rental Corp., Pan American Investment
Corporation, Charles Holdings, Inc., and
Doeskin Products, Inc.,
Defendants-Appellants.
 No. 291, Dockets 26723, 26796.
 United States Court of Appeals Second Circuit.
 Argued Feb. 14, 1961.
Decided April 13, 1961.
 
 Thacher Proffitt, Prizer, Crawley & Wood, New York City (Edward C. Kalaidjian, John C. Crawley and Robert S. Stitt, New York City, of counsel), for appellee.
 Meyer, Kissell, Matz & Seward, New York City (Lester Kissel and James C. Quigley, New York City, of counsel), for appellants Fred Tabah and Pan American Inv. Corp.
 McCarthy, Kapelman & Nathanson, New York City (I. Z. Nathanson and Samuel Aleyner, New York City, of counsel), for appellants Doeskin Products, Inc. and Clayville Truck Rental Corp.
 Samuel H. Levinkind, New York City, for appellants Louis A. Schnider, Sol Kurlander and Charles Holdings, Inc.
 Walter P. North, Gen. Counsel, and Irving M. Pollack, Asst. Gen. Counsel, Washington, D.C. (Kiva Berke, New York City, of counsel), for the Securities and Exchange Commission, amicus curiae.
 Ernest Angell, New York City (William Stackpole, New York City, of counsel), on behalf of himself, opposing the petition for writ of mandamus brought by appellants Doeskin Products, Inc.
 Before LUMBARD, Chief Judge, and CLARK and SMITH, Circuit Judges.
 SMITH, Circuit Judge.
 
 
 1
 This appeal represents yet another in the long series of attempts to straighten out the financial chaos and ruin left by Lowell M. Birrell when that gentleman forsook these shores for those of our southern hemisphere neighbor, Brazil.[1] Plaintiff is Trustee in Reorganization of the Equitable Plan Company, a California industrial loan company allegedly milked of $8 million by Mr. Birrell. Defendant Doeskin Products, Inc. fared no better in the hands of Birrell and his associates. It is estimated that more than ten million dollars was stolen from the latter corporation.
 
 
 2
 The action is a derivative one, Equitable claiming as the holder of roughly 200,000 shares of Doeskin stock. The defendants, other than Doeskin, are present and past past officers and directors of that corporation-- and outsiders-- claimed to be responsible for or privy to a number of alleged swindles which have resulted in the looting of Doeskin.
 
 
 3
 Plaintiff claims that in September of 1957 Birrell, then a director and Chairman of the Board of Doeskin Products, contrived to fraudulently issue 1,070,000 shares of stock which had been authorized but were still unissued by the corporation. The stock was issued to a Panamanian corporation, Darien, Compania de Inversiones y Finanzas, S.A. That corporation was the holding company for a murky and mysterious 'Cuban group' headed by one Jose Capmany, in whose name the shares were registered. It is alleged that this group was at all times merely a 'front' for Birrell. 'Payment' was nominally made with a check for $2,140,000 to Doeskin. Immediately, however, Birrell caused Doeskin to write a check for that amount in favor of its wholly owned subsidiary, Keta Gas & Oil, which corporation, in turn, drafted a similar check payable to Cubanda, a wholly owned subsidiary of Keta. Cubanda apparently never was anything more than a corporate shell totally devoid of assets and none can be presently found. None of the defendants in this action claim that Doeskin received any actual consideration for the huge bloc of shares nor do any of them seriously dispute the larcenous nature of the transaction.
 
 
 4
 Seventy thousand of the shares, after being used to cover some of Birrell's debts with a Canadian brokerage house, were promptly sold back to Doeskin for $100,000. Then, in February of 1958, the remaining one million shares were 'sold' by Darien to defendant Charles Holdings, Inc., a Canadian corporation owned by defendants Smiley[2] (5/6) and Schnider (1/6). The stock was bought for one dollar a share and was obtained for $30,000 in cash plus $970,000 in non-interest bearing promissory notes which were neither endorsed nor guaranteed nor collateralized.[3] From the time of this transaction until Judge Palmieri appointed a receiver, the so-called 'Canadian group' was in control of Doeskin's management. In addition to Smiley and Schnider, this group includes defendants Leznoff, Kurlander, Cutler and Perlmutter.
 
 
 5
 Late in 1958 there was a further sale, by Charles, of Doeskin stock. Smiley had, in February, approached defendant Fred Tabah, president of Pan American Investment Corporation (another defendant), concerning the purchase from Darien of the million shares. While Tabah was not interested at that time, he told Smiley to see him again in the Fall. In December, Pan American purchased from Charles 200,000 shares of Doeskin. The consideration of $183,000 was paid in three installments-- in December of 1958 and in May and June of 1959. A contract was executed between Pan American and Doeskin whereby the latter obtained the services of Tabah as president of Doeskin for a five year term beginning January 1, 1959.
 
 
 6
 In June of 1959 Smiley and Charles Holdings began negotiations for still another transfer of Doeskin stock. A Zurich attorney named Sandberg allegedly contacted Smiley on behalf of an undisclosed principal concerning the availability of the one million shares. Smiley finally went to Switzerland the week of August 10, 1959 and contracted to sell Liechtenstein corporation Reg. Trust, a liechtenstein corporation with headquarters in Zurich, 600,000 shares of Doeskin common. The consideration for this 'sale' was the return of $600,000 of Charles Holdings, Inc. notes in favor of Darien, which notes had somehow found their way into the hands of Synta. The other terms of the transaction were perhaps even more strange. Charles Holdings was given an irrevocable proxy to vote the shares and Synta bound itself not to sell, transfer or hypothecate the stock without the written consent of Charles; the Canadian management was to continue operating Doeskin with no participation by Synta.
 
 
 7
 Although plaintiff's principal court concerns the invalidity of the million shares, he has also advanced numerous other claims of corporate plundering. Shortly after the inception of the Smiley Regime, in March of 1958, defendant Juan F. Aguilar-Leon presented a claim, as assignee of Jose Capmany, for $53,500, the alleged brokerage commission on the sale of the 1,070,000 shares of stock.[4] Director Henderson has testified in other proceedings that he objected streneously to the payment of this claim. He asserted that the usual trade custom was that the broker deducts his fee from the proceeds of the sale. He also pointed out that there was no reference in the minutes of Doeskin's Board of any agreement to pay any commission nor was there any such contract in the corporation's files. He noted that it was strange that this first demand for payment came a full six months after the sale and urged that the size of the demand alone militated in favor of further study. Nevertheless, a payment of $20,000 on account was made immediately to Leon and the balance was paid shortly thereafter, a small deduction having been made for such prompt cash remittance.
 
 
 8
 Another charge of corporate misfeasance is leveled at Smiley & Co. because of Doeskin's payment, in July, 1958, of a claim by Lomega Explorations, Ltd. for $50,000. The claim was presented by one Jay Fisher, currently vacationing with Birrell in Brazil,4A who was allegedly, at that time, a 'notorious accomplice' of the master swindler. At the time of this payment, Doeskin's wholly owned subsidiary, Keta, had claims against Lomega totaling in excess of $50,000.
 
 
 9
 Plaintiff further claims that Doeskin's management illegally siphoned money out of the corporation by payments to suppliers of the company. A contract was entered into with the Bell Container Corp. for that company to provide Doeskin with corrugated boxes in which to market its products. Bell supplied Doeskin with most of its needs in that line from August, 1958 until early in 1960. It is alleged that defendant Daspin, president of Bell, obtained and kept the benefits of that contract only by making large payments totaling $47,000 to Harry Workman, also a defendant, a Canadian, and, like Leon and Fisher, closely linked to Birrell.
 
 
 10
 The Clayville Truck Rental Corp. was a corporation formed in January of 1959. Daspin and Harold J. Simon, a New Jersey trucking executive, each owned 10% Of its capital stock, the remaining 80% Interest being held by Abe Weitzman, still another Candaian and alleged also to be an intimate of Lowell Birrell. Doeskin then proceeded to transfer all of its trucking business to Clayville. In 1960 Doeskin purchased all of the stock in Clayville and since that time has been supplying its own trucking needs. Although the books of Clayville indicate that Weitzman probably never paid a penny for his stock, he received more than $150,000, in various forms, from his Clayville 'venture.' Another fact of great significance is that Clayville paid an attorney, Sidney Hellenbrand, $5,000 to satisfy a debt owed that gentleman by Lowell Birrell in connection with prior criminal and disbarment proceedings.
 
 
 11
 Finally, the trustee charges that the defendant officers and directors of Doeskin have been bleeding the corporation through excess travel, amusement and subsistence allowance and through the submission of 'fees.' The top echelon of management, as aforestated, is almost exclusively made up of Canadians. The corporation has been assuming the ccommuting' expenses on weekends and has been paying the weekday New York hotel bills. As of September 3, 1960 there were 'advances' outstanding, in excess of salary and expense allowances, to Tabah, Schnider, Cutler and Kurlander, totaling $27,450. Although Smiley's 'advance' account as of that date was 'only' $11,700, there is evidence that in May of 1960, anticipating an examination of Doeskin's account books by a bankruptcy referee in Equitable's ancillary proceedings, Smiley hurriedly submitted vouchers, promptly approved by the Board of Directors, covering 'services' for the preceding two years. The plaintiff strongly challenges the bona fides of those privy to that action and charges that Smiley, through his advance account, has been illegally appropriating large amounts of corporate funds.
 
 
 12
 The Proceedings Below.
 
 
 13
 Defendants moved before Judge Palmieri below, in the District Court for the Southern District of New York, for a stay of the entire proceeding pending the outcome of a similar action in the New York state courts, Weinberger v. Bradley, Sup., 210 N.Y.S.2d 658. That state action is the consolidation of three stockholder suits brought by minority holders of Doeskin to void the one million shares alleged to have been fraudulently issued by Birrell. Defendants contended that an order issued by the state court enjoining any further stockholder actions[5] effectively prevented the trustee from pressing this suit. They further argued that because the New York court had taken prior jurisdiction over the corporation the Federal Court could not or should not entertain the action.
 
 
 14
 Overruling these objections, Judge Palmieri, on November 17, 1960, denied the motion for a stay. At that same time he appointed a 'special fiscal agent'[6] to oversee and pass upon all expenditures made by Doeskin. The court, at that time, declined to grant plaintiff's request for the more drastic remedy of a receivership. Five days later, however, all of the principal officers and directors of Doeskin were arrested by Federal officers in connection with charged violations of the Securities Act of 1934, 15 U.S.C.A. 78j(b), 78ff(a). See Rule X-10b-5 promulgated by the Securities and Exchange Commission, 17 C.F.R. 240.10b-5.[7] When plaintiff, at this juncture, immediately renewed his motion for the appointment of a receiver, Judge Palmieri granted it-- directing the special fiscal agent to take over active operation of the corporation.
 
 
 15
 On December 23rd, Judge Palmieri issued an order directing the defendants Tabah, Pan American, Synta, Charles Holdings, Schnider, and Smiley (as president of Charles) and Abraham Glickman, the escrowee of a quarter of a million shares in the state court action, to show cause why the transfer of those shares should not be enjoined and the shares should not be enjoined and the certificates not be impounded in the court issued the impounding order; the stock certificates were to have been deposited with the court by January 6, 1961.
 
 
 16
 When defendants failed to comply with this order, plaintiff then moved to have them held in contempt. A hearing was held on January 16th and another one was scheduled for the 24th of that month, Judge Palmieri ordering that Schnider, Tabah and Smiley appear at that time. Tabah and Smiley failed to appear in court on the date set although the latter was in New York on the 23rd of January and on the morning of the hearing. At the conclusion of the hearing the court cited Tabah, Smiley, Charles and Pan American in contempt of court and on February 2nd ordered them so adjudged. Judge Palmieri at that time also ordered a denial, to those defendants, of the privileges of the court except in matters of strict right. He issued a further order that the shares be deposited by February 23, 1961 on the threat of fine or imprisonment.
 
 
 17
 Defendants are presently appealing the denial of the motion to stay proceedings. They also challenge the legality and propriety of the orders appointing the fiscal agent, the granting to him of powers of a receiver and the order enjoining transfer of the stock and impounding the certificates-- along with the subsequent contempt orders.
 
 
 18
 One further matter presently before us is a writ of mandamus sought by appellant Doeskin requesting an order striking Judge Palmieri's order of December 30, 1960 substituting Ernest Angell, Esq. in place of McCarthy, Kapelman & Nathanson as counsel for Doeskin. By the terms of that order, the trial court directed that the Nathanson firm should continue their representation for purposes of the instant appeal.[8]
 
 
 19
 The granting or denial of such a motion for a stay ordinarily is not an appealable order. Mottolese v. Preston, 2 Cir., 1949, 172 F.2d 308; Day v. Pennsylvania Railroad Co., 3 Cir., 1957, 243 F.2d 485. The contentions raised by defendants in this regard, however, are also germane to their attack on the affirmative orders entered by the court below and therefore must be considered.
 
 
 20
 The propriety of any proceedings in this case is challenged because of the pendency, in the state courts, of Weinberger v. Bradley, supra. Defendants argue that both the Weinberger case and the action at bar are in rem proceedings; because the New York County Supreme Court had prior jurisdiction over the res (the corporation and the disputed shares of stock), the Federal court cannot assume jurisdiction.
 
 
 21
 While defendants have stated the law correctly concerning consecutive in rem suits, Penn General Casualty Co. v. Commonwealth of Pennsylvania, 1935, 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850; Kline v. Burke Construction Co., 1922, 260 U.S. 226, 43 S.Ct. 79 67 L.Ed. 226, they are wide of the mark in their attempted characterization of the earlier state court proceedings. Although an action to adjudicate the validity of a bloc of corporate shares might property be characterized as in rem,[9] the state court had never effectively taken control of the disputed shares.[10] As a practical matter, therefore, the Weinberger action had been proceeding in personam and the Federal court was not completely foreclosed from entertaining this suit.
 
 
 22
 There is no rule of law preventing two in personam suits involving the same parties, even if the claims and issues are identical, from proceeding concurrently in different courts. Kline v. Burke Construction Co., supra. Because of the unique problems presented by stockholder litigation, however,-- the almost limitless possibility for multiplicity of suits with its resultant disastrous effect on the corporate treasury, there has grown up a judicial trend to stay subsequently initiated derivative actions to await a final decision in an earlier suit, wherein the rights of all parties would be adjudicated. Mottolese v. Kaufman, 2 Cir., 1949, 176 F.2d 301; Reiter v. Universal Marion Corp., D.C.D.C.1959, 173 F.Supp. 13; Levy v. Pacific Eastern Corp., 1935, 154 Misc. 655, 277 N.Y.S. 659. It is clear from the foregoing cases, however, that the granting or denial of such a stay rests within the discretion of the trial court.[11]
 
 
 23
 Under the circumstances here present it would appear that Judge Palmieri has wisely exercised that discretion in proceeding with the Federal suit. Although the main claim in the two actions, the invalidity of the 1,000,000 shares, is the same, the complaint in this suit is broader in scope than in Weinberger, the latter pleadings making no mention of the alleged Bell Container and Clayville Trucking swindles-- nor does it include the issue of excessive advances to management. While the line-up of parties is likewise largely similar, here too the complaint in the Federal action is somewhat broader. The trustee further alleges that the general counsel in the state court action is not vigorously prosecuting that suit in the best interests of all the shareholders. Coupled with these factors is the consideration that there has been no showing thus far that Doeskin has been overly burdened by multiple litigation; the Weinberger suit is the only other stockholder action pending.
 
 
 24
 The injunction agatinst all further suits issued by the New York Supreme Court in Weinberger is likewise ineffective to prevent these proceedings in the Federal courts. That injunction was not specifically directed at the plaintiff-- who is not a party in the state court. Because of the special responsibilities placed on trustees in reorganization to marshal the assets of the estate and to protect the interests of all of the debtor's equity and debt holders, we believe a construction should be adopted which will best effectuate the policies of the Bankruptcy Act. Since the state court injunction was not in terms directed to the trustee, we think he should not be foreclosed here. We do not reach, however, the problem of the extent of any res judicata effect upon the trustee of a judgment reached in Weinberger before the court below has reached a final decision.
 
 
 25
 Also, by way of a general attack on the orders entered below, appellants insist that plaintiff has no standing. They point to the fact that Equitable is not registered as the owner of the 200,000 shares and they argue that these shares 'must be' part of a 700,000 share bloc found, in earlier litigation, to have been fraudulently issued. Pettit v. Doeskin Products, Inc., 2 Cir., 1959, 270 F.2d 95. There is no merit in this position. It is undisputed that the trustee has possession of the shares. They were allegedly acquired as pledge collateral for loans made by Equitable, some from other origin than the 700,000 share bloc, and the trustee now claims ownership as a result of defaults on these loans. The allegation of ownership was made in the verified complaint and that is sufficient to allow the trustee to reach the merits of his claim. The further fact that Equitable has a claim for damages against Doeskin does not affect its right, as a substantial stockholder in Doeskin, to enforce that corporation's legal rights. While plaintiff has prima facie established its standing, proof at trial that its shares are void may, of course, be grounds for a dismissal at that time.
 
 
 26
 Appellants, not relying solely on their general attacks on the lower court proceedings, claim that there was insufficient factual justification to support the impounding order and the appointment first of a fiscal agent and then later granting receivership powers. We disagree. The first two orders mentioned are clearly supported by the record and, although it is a close and more difficult question, appointment of the receiver was also within the discretion of the court.
 
 
 27
 The bizarre history of the issue and transfers of the one million shares fairly demands that the court take physical possession of the certificates. There is no dispute as to the fraudulent nature of the original issue of the stock. Smiley and Schnider have offered no convincing explanation as to how they obtained such a huge bloc of stock within six months of the fraud without making inquiries sufficient to raise serious suspicions as to the validity of the shares. Indeed, the strange financial arrangements between Darien and Charles Holdings strongly suggest that no such explanation can be made. Although Tabah and Pan American ostensibly at least gave good consideration for 200,000 sharees, there is some evidence that their title may be no better than that of Charles.[12]
 
 
 28
 Appellants argue that the shares are non-negotiable because of a notation on the face of the certificates making them subject to the outcome of litigation. While this is most likely true, Judge Palmieri was nonetheless warranted in attempting to insure the non-transfer of the shares. As can be seen from prior transactions, the shares are likely to be negotiated in almost any country on the globe. If plaintiff emerges victorious in this action or in Weinberger, he should not have to face even the danger of further litigation. Any possibility that his victory might be turned into a pyrrhic one due to the law of negotiable stock transfers in Dr. Castro's Cuba, Liechtenstein, or any other jurisdiction, warrants the impounding of the stock. The fact that defendants' stock may later be subject to attachment in New York if they are successful is no good reason to allow the shares to stay at large. The contempt orders are likewise justified. They followed only too naturally from the impounding order and the open flouting of the court by Smiley and Tabah.
 
 
 29
 In passing upon lower court preliminary orders it is often quite difficult properly to weigh the factual considerations, based as they are almost exclusively on carefully warded affidavits of 'information and belief' which include, possibly, much incompetent and inadmissible evidence. Such is the situation concerning the financial history of Doeskin since the Canadian group assumed control in 1958. Nevertheless, there is a sufficient basis for a tentative, preliminary finding of extreme fiscal irresponsibility, if not dishonesty, thereby justifying the appointment of a 'watch-dog' to supervise Doeskin's expenditures.
 
 
 30
 The prompt payment of the Leon-Capmany brokerage claim and a similar response to the Lomega, Ltd. $50,000 claim are both highly suspect. Even if the allegation that Jay Fisher and Capmany were 'well known cohorts' of many were 'well known cohorts' of that virtually all extrinsic factors militated against payment on both demands. The Lomega claim was supported only by a memo of Birrell while he was in direct control of Doeskin-- which should have served as an immediate warning flag to responsible management. The fact that Doeskin's Board and officers did not suspect, in March of 1958, that something was 'missing' from the alleged $2 million plus payment for the stock issue of the preceding autumn defies belief. The corporate minutes directing repayment of the Lomega Loan state that the sum was credited to the 'Birrell-Larson escrow account' and that the Doeskin books do not reflect the loan. After the payment was made, it was recorded on the Doeskin books as an additional claim against Birrell. The justification put forth in the affidavits of appellants, that Doeskin 'could not afford' law suits, is unconvincing.
 
 
 31
 The Bell Container and Clayville Trucking episodes add fuel to the fire. These arrangements have been strongly defended as having been economically justified. While that may be so, it is at this point a matter of dispute. What is clear, however, is that Bell received the Doeskin business upon the payment of bribes to Workman-- who has been reliably linked to Birrell. The payment by Clayville of Birrell's personal legal fees plus the unexplained 80% Interest of Weitzman tend further to link appellants with Birrell.
 
 
 32
 Finally, there is a rather strong showing that management, especially Smiley, personally had been drawing lavishly out of the corporate coffers sums in excess of their contracted for rewards. The hurried submission of vouchers by Smiley in May of 1960, covering a two year period but nonetheless promptly rubber stamped by the Board, is highly suspicious.
 
 
 33
 There is little doubt that the financial history of Doeskin since 1958 supports strongly the appointment of the fiscal agent. While the corporation is still solvent, Judge Palmieri found that the status of the company had deteriorated dangerously. Although the contending parties draw entirely conflicting conclusions from the books of the corporation, Judge Palmieri appears justified in his fears. While some of the transactions may be ascribed only to the Smiley management, i.e. the Capmany claim, the Lomega, Ltd. claim and the Bell Container deal, it was under the Tabah presidency that the Clayville venture was put into effect-- and Tabah also conducted the later purchase of the Clayville stock. The ratification of almost $50,000 of Smiley's prior advances also took place under the aegis of Tabah.
 
 
 34
 The order granting the receivership presents a much more difficult problem. It is a drastic remedy usually imposed only where no lesser relief will be effective. Clark, Receivers 59, 744 (3 ed. 1959). It would ordinarily be presumed that a 'watchdog' over all expenditures should be sufficient to safeguard the corporate treasury from further depredations. Plaintiff's affidavits, however, present a picture of corporate dishonesty which is, for all its boldness, often quite subtle. It might be difficult for a fiscal agent to dig effectively beneath the surface of many transactions submitted for his approval. As much as it defies the imagination, it appears at least probable that the master swindler, Birrell, has kept his tentacles on Doeskin even while he has been a fugitive in Brazil. A fiscal agent, as a last step 'check point,' might not be sufficient properly to protect Doeskin.
 
 
 35
 Another relevant consideration is that the factors usually militating against the appointment of a receiver are not so strong in this case. Doeskin's credit position has been severly jolted over the last decade by the apparent repeated raids by its management. The fact that Birrell may still be behind the scenes is surely no asset. On balance, it is not unreasonable to hope for even a comparatively favorable response from financial and credit institutions because of the appointment of the receiver.
 
 
 36
 A final point-- and the one which precipitated the appointment below-- was the arrest of virtually all high Doeskin officials in connection with alleged violations of the Securities Act and mail fraud provisions of the United States Code, 18 U.S.C.A. 1341, 1342.[13] While this was not new 'evidence' of misdeeds, it did present a situation where there was a possible complete breakdown of the Doeskin high command. Judge Palmieri apparently felt that this threat was sufficient to tip the balance in favor of a receiver and we concur.
 
 
 37
 In their attack on the orders concerning the impounding of the stock and the appointment of a receiver for Doeskin, appellants assert that the district Court acted improperly in failing to require the posting of a bond by the Trustee as security against possible losses resulting from those orders. Contrary to appellants' representations, the record reveals that Judge Palmieri's order appointing a fiscal agent was conditioned on the posting, by plaintiff, of a $2,500 bond. In the .absence of a mandatory statute, the matter of a bond is for the discretion of the trial court, Bank of Shirley v. Bonds, 1929, 178 Ark. 1079, 13 S.W.2d 816; Benton v. Turk, 1939, 188 Ga. 710, 4 S.E.2d 580; Moritz v. Miller, 1889, 87 Ala. 331, 6 So. 269, and in view of the probable prior mismanagement and in the absence of any showing by defendants that there was a likelihood of any resultant loss, the security was adequate. The law is similar as regards the order restraining transfer of and impounding the certificates. Rule 65(c) F.R.Civ.P., 28 U.S.C.A., provides that
 
 
 38
 'No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper * * *.' The last cited phrase indicates that the District Court is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm, Urbain v. Knapp Brothers Manufacturing Co., 6 Cir., 1954, 217 F.2d 810, or where the injunctive order was issued 'to aid and preserve the court's jurisdiction over the subject matter involved * * *.' Magidson v. Duggan, 8 Cir., 1950, 180 F.2d 473, 479, certiorari denied 339 U.S. 965, 70 S.Ct. 1000, 94 L.Ed. 1374. In the instant case, the share certificates were non-negotiable according to appellants' own contentions and there has been absolutely no showing of probable loss because of the restraining order; under the circumstances, the entry of the orders without requiring a bond was within the discretion of the District Court.
 
 
 39
 The petition for a writ of mandamus to strike the order of the court below substituting attorneys for Doeskin is pressed mainly on the claim that Judge Palmieri, by altering the earlier order after the filing of notice of appeal, impinged on the appellate jurisdiction of this court. The argument is without merit. Rule 62(c), F.R.Civ.P., 28 U.S.C. gives the trial court power to modify injunctions pending an interlocutory or final appeal. Since an order appointing a receiver is injunctive in nature-- and in light of the fact that any other view would make the conduct of business by a receiver almost an impossibility in the interim period-- we hold that Rule 62(c) applies to the order in question. The weakness of petitioner's position is further accentuated by the fact that the original order appointing McCarthy, Kapelman & Nathanson to continue as attorneys for Doeskin was specifically made 'subject to the further order of the court.' The rights of Doeskin have been amply protected by the designation of the McCarthy firm to continue as corporate counsel for the prosecution of this appeal. This is not one of those 'really extraordinary causes' warranting issuance of mandamus. Ex parte Fahey, 1947, 332 U.S. 258, 260, 67 S.Ct. 1558, 1559, 91 L.Ed. 2041.
 
 
 40
 The appeal from the denial of a stay is dismissed.
 
 
 41
 The orders impounding the stock certificates and appointing a fiscal agent and receiver are affirmed.
 
 
 42
 The writ of mandamus is denied.
 
 
 
 [1]
 The misguided financial genius of Mr. Birrell has received nationwide periodical treatment in the November, 1959 issue of Fortune and in a July, 1959 issue of Life
 A representation of the scope of the judicial business created by Birrell can be found in Birnbaum v. Birrell, D.C.S.D.N.Y.1955, 17 F.R.D. 409; Saltzman v. Birrell, D.C.S.D.N.Y.1957, 156 F.Supp. 538; Claude Neon, Inc. v. Birrell, D.C.S.D.N.Y.1959, 177 F.Supp. 706; Pettit v. Doeskin Products, Inc., 2 Cir., 1959, 270 F.2d 95, rehearing denied 2 Cir., 270 F.2d 699, certiorari denied 362 U.S. 910, 80 S.Ct. 660, 4 L.Ed.2d 618; Grubbs v. Pettit, 2 Cir., 1960, 282 F.2d 557; Ings v. Ferguson, 2 Cir., 1960, 282 F.2d 149; Ferguson v. Bartels Brewing Co., 2 Cir., 1961, 284 F.2d 855; Weinberger v. Bradley, Sup., 210 N.Y.S.2d 658. This sampling of cases by no means exhausts all of the Birrell inspired litigation and the complete unraveling of his affairs will undoubtedly spawn even more cases in the future.
 
 
 [2]
 In addition to the listed group of defendants-appellants in the title, there is a large number of named defendants who are not now appealing these preliminary orders. Many of them are outside the jurisdiction and have not been served with process. Because some of them are important figures in the factual framework of the case, however, they have been alluded to in the opinion. Those defendants not appealing are Lowell M. Birrell, Samuel J. Smiley, Joseph Leznoff, Harry Workman, Harold J. Simon, Edward I. Daspin, Abe Weitzman, Juan F. Aguilar-Leon, Raul De Juan, Joseph W. Crosby, Susan R. Miller, Harry M. Cutler, H. W. Perlmutter, Bell Container Corporation and Synta Corporation Reg. Trust
 
 
 [3]
 Defendants Smiley, Schnider and Charles Holdings, Inc. argue that Darien had as its collateral the right to repossess the stock certificates. Since it is conceded by all parties, however, that the original issue to Capmany and Darien was fraudulent, it is inconceivable that this same group, seeking to truly 'unload' its stock, would demand for its 'collateral' only the right to regain those same shares. As Darien could not hope to qualify as a holder in due course, it is reasonable to infer that they, upon a true sale of the pirated stock, would insist either upon cash or independent collateral
 
 
 [4]
 Aguilar-Leon was also, at that time, Secretary of Cubanda which was the final repository of the 'proceeds' of the previous year's 'sale.'
 4A It has just been brought to the author's attention at time of printing that Fisher has been apprehended by Federal authorities in New York and is presently in their custody (see infra footnote 7).
 
 
 [5]
 That order was handed down on June 27, 1958 by Justice Vincent A. Lupiano of the Supreme Court, New York County. Its pertinent provision reads as follows:
 'Ordered that all other stockholders of the defendant Doeskin Products, Inc., be and they hereby are stayed from instituting any actions, suits or proceedings from and after the date hereof, on behalf of said corporation or otherwise, against any of the defendants in the above entitled actions, to the extent that such actions, suits or proceedings are based on the transactions complained of in any of the complaints in the above entitled actions as consolidated; * * *'
 
 
 [6]
 That designation had been used by a New Jersey equity court when dealing with a somewhat similar problem. Roach v. Margulies, 1956, 42 N.J.Super. 243, 126 A.2d 45
 
 
 [7]
 Although not part of the record before this court, it may be noted that since the oral argument defendants Tabah, Smiley, Birrell, Schnider, Jurlander, Leznoff, Charles Holdings, Pan American, Synta, Workman and Capmany, along with others, have been indicted by a Federal grand jury in the Southern District of New York for violation of stock fraud and mail fraud provisions of the United States Code. The indictment covers the alleged fraudulent issue and later transfers of the 1,070,000 shares of Doeskin common and also the payment of the $53,500 commission claim and the Lomega, Ltd. claim of $50,000
 
 
 [8]
 Upon agreement of the parties it was also stipulated that McCarthy, Kapelman & Nathanson would continue to represent Doeskin in the Weinberger action. Provision was made, in the court's order, for the Nathanson firm to later apply to the court for approval of the fees submitted for services to be rendered Doeskin on this appeal; it was not a final order
 
 
 [9]
 In rem proceedings are usually broadly defined as those actions in which the court must possess or control the property in order to make effective the relief it grants. Penn General Casualty Co. v. Commonwealth of Pennsylvania, supra, 294 U.S. at page 195, 55 S.Ct. at page 389; 1 Moore's Federal Practice P0.214, p. 2501
 
 
 [10]
 Mr. Justice Aurelio Directed on January 24, 1961, subsequent to Judge Palmieri's impounding order, that Mr. Glickman, escrowee of 250,000 of the shares, deposit his shares with the Clerk of the Supreme Court, County of New York. That order was entered on the motion of the attorneys for the plaintiff herein-- and its obvious purpose was to relieve the escrowee from any possible liability because of the conflict between his state court duties as escrow agent and the Federal order to produce the stock. That order, being subsequent in time to the District Court impounding order, cannot affect the legality of Judge Palmieri's order-- and Judge Aurelio appears to have tentatively recognized this fact when he provided that the Clerk of Court take the shares 'pending further order of the United States District Court for the Southern District of New York in the cause entitled Ferguson v. Birrell, et al.'
 The propriety of the impounding order itself will be discussed infra.
 
 
 [11]
 Indeed, only 11 years ago the question which divided a panel of this court was whather or not the trial court had any discretion to stay a subsequent stockholder's suit and thus deny to the plaintiff his right in the courts of the United States. See dissenting opinion of Judge Frank in Mottolese v. Kaufman, supra
 
 
 [12]
 As noted supra, Pan American paid for its stock by check in three installments. The first check was made payable directly to Smiley and bears the notation 'Re: Charles capital stock,' while the two later payments, made after the institution of the Weinberger action, were made directly to Charles Holdings. In addition to the problem as to whether Pan American can assume any greater right than Charles, there is at least a doubt as to its status concerning amounts over and above $58,000, the only amount paid before the entire issue was challenged in Weinberger
 
 
 [13]
 See note 7 supra