**C. E. H. McDONNELL, as Trustee in Reorganization of Equitable Plan Company, Plaintiff,**

v.

**Lowell M. BIRRELL et al., Defendants.**

United States District Court
S. D. New York.
July 17, 1961.

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, for plaintiff. Edward C. Kalaidjian, John C. Crawley and Robert S. Stitt, New York City, of counsel.

Ernest Angell, New York City, for Thomas J. Connellan and Frank I. Bertsch, Fiscal Agents of Doeskin Products, Inc.

Haight, Gardner, Poor & Havens, New York City, for defendant, Joseph W. Crosby. Richard L. Maher, New York City, of counsel.

Zelby & Burstein, New York City, for defendant, Harold J. Simon. Herbert Burstein and Seymour Teitlebaum, of counsel.

Samuel H. Levinkind, New York City, for defendants, Samuel J. Smiley, Charles Holdings, Inc., Harry M. Cutler and Louis A. Schnider.

Leinwand, Grossman & Maron, New York City, for defendants, Edward I. Daspin and Bell Container Corp., Isidor E. Leinwand and Allan Graff, New York City, of counsel.

Moses L. Kove, New York City, appearing specially for Fred Tabah.

Also present:

Mr. Samuel J. Smiley.

Mr. Fred Tabah.

Mr. Louis A. Schnider.

PALMIERI, District Judge.

### Preliminary Statement

On July 5, 6 and 7, 1961, the first cause of action in this derivative suit was tried before me. The trial followed many months of dedicated effort by plaintiff's counsel to expose a bold and outrageous corporate swindle. The issues now presented for final adjudication relate to plaintiff's prayer for the return and cancellation of one million fraudulently issued shares of Doeskin Products, Inc. (Doeskin). Although this huge bloc of shares represented control of Doeskin, no consideration was ever received by the corporation for any of the shares involved in this issue.

Much of the background of this litigation has been detailed at earlier stages in the proceedings when plaintiff's efforts to obtain interlocutory relief were vigorously opposed by defendants and their representatives. See Ferguson v. Birrell, D.C.S.D.N.Y.1960, 190 F.Supp. 506, affirmed sub nom. Ferguson v. Tabah, 2 Cir., 1961, 288 F.2d 665. During the prior proceedings, plaintiff's contentions were assailed as speculative and without evidentiary basis. Defendants' averments, it is now conceded, were replete with misstatements, significant omissions and distortions designed to conceal from the court the audacious scheme which defendants were undertaking and, indeed, hoped to accomplish with the judicial approval of the state court.

At the time of this trial, certain events had occurred which considerably altered the posture of the defense. Defendants Birrell, Workman, Tabah, Smiley, Schnider, Kurlander, Leznoff, Charles Holdings, Inc., Pan American Investment Corp., and Synta Corp., along with others, had been indicted by a Federal grand jury in this district for violations of stock fraud and mail fraud provisions of the United States Code. Among other things, the indictment covers the fraudulently issued shares which are the subject of the plaintiff's first cause of action. The defendants who testified at this trial, Tabah, Smiley and Schnider, have entered pleas of guilty to counts of the indictment and are now awaiting sentence.

A further significant event was the permanent stay of a derivative action which had been pending in the New York State Supreme Court for New York County based upon a complaint similar to that filed by the plaintiff here. It is no longer disputed that defendants intended

to use the state court action as an instrument to render saleable their fraudulently acquired Doeskin shares. The plan was to obtain court approval for a proposed settlement pursuant to which one-quarter of the million shares would be returned to Doeskin's treasury while defendants' title to the remaining three-quarters would be secured. Cf. 190 F. Supp. at page 509, n. 10, supra. The permanent stay of the state court action was effected with the consent of counsel for the plaintiffs therein. Upon the directions of this court and the New York State Supreme Court, New York County, the escrowee of the 250,000 Doeskin shares that were offered in settlement of the state court action, deposited those shares with the Clerk of this Court to be held in his custody pending the disposition herein. See Order of April 21, 1961 entered in Weinberger v. Bradley, Sup., 210 N.Y.S.2d 658; Orders of December 31, 1960, April 21, 1961 and May 18, 1961, entered in Ferguson v. Birrell, 60 Civ. 4007 (S.D.N.Y.).

Faced with this changed situation, defendants Smiley and Schnider gave testimony here which laid bare the nature of the scheme in which they were participants. These witnesses made it abundantly clear that "the master swindler," Lowell M. Birrell, had in fact engineered the fraudulent issue to keep "his tentacles on Doeskin". Indeed, "as much as it defies the imagination," Birrell was able to profit financially by siphoning funds out of the Doeskin treasury even while he was a fugitive in Brazil. See 288 F.2d at page 674, supra. Birrell's principal associate in this venture was Harry Workman, a Canadian defendant, who, like Birrell, has chosen to remain outside this jurisdiction. Defendants Smiley and Schnider testified to the manner in which they fronted for Workman who actually held the lead rein of Doeskin and controlled 800,000 of the million fraudulently issued shares up until the time fiscal agents for the corporation were appointed by this court. The testimony also disclosed the sham roles played by the Canadian corporation, Charles Holdings, Inc. and the Liechenstein corporation, Synta Corporation Reg. Trust, companies formed for the purpose of perpetuating the larceny contrived by Birrell and Workman.

Smiley and Schnider, having admitted that they acted solely as nominees or "fronts" for Workman, no longer claim any interest in the Doeskin shares and have not resisted the remedy sought by plaintiff. The final decree with respect to the 800,000 Workman shares, i. e., those which appeared to have been held by Charles Holdings, Inc. and Synta Corp. will be filed herewith.

Defendant Tabah, on the other hand, continues to claim the status of a bona fide purchaser. Unlike Smiley and Schnider, Tabah appears to have paid "hard cash" for the 200,000 shares purchased by his family holding company, Pan American Investment Corp. Tabah asserts that it was not until he had paid for the shares and had embarked upon his duties as president of Doeskin that he learned of Workman's controlling interest and the larcenous nature of the prior transactions.

Based upon the trial testimony I have grave doubts as to Tabah's credibility and his ability to establish his status as a purchaser in good faith. As the record now stands, it appears highly improbable that, at the time of his purchase, Tabah failed to suspect the validity of the shares and to make appropriate inquiries with respect thereto. See 288 F.2d supra, at page 673, note 12. Moreover, Tabah's admitted attempts to conceal the truth from both this court and the state court in his effort to accomplish a settlement of the matter highly favorable to himself and others privy to the larcenous scheme, are hardly consistent with his description of himself as an honest man, sorely deceived and cheated by his business associates. Nevertheless, and despite the substantial payments received by Tabah through his incumbency of the Presidency of Doeskin, I am mindful of the fact that Tabah appears to have parted with $183,000 for the Doeskin shares and that he did not have the assistance

of counsel at this trial. Although I do not condone Tabah's failure to obtain representation after adequate and repeated notice of the probable time of this trial, I prefer not to enter final judgment with respect to his shares until he has been afforded a further opportunity to engage and consult with counsel. Accordingly, I have given Tabah a period of thirty days from the conclusion of the trial to appear through counsel and to submit proof which might offset the strong showing against him made by plaintiff on the present record.

See Findings of Fact and Conclusion of Law, and Judgment filed herewith.

### Findings of Fact

1. Plaintiff is the trustee in reorganization of Equitable Plan Company, an industrial loan corporation organized under the law of California and currently a debtor in a reorganization proceeding under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., pending in the United States District Court for the Southern District of California, Central Division. This action was instituted pursuant to an order of the bankruptcy court. See Order No. 86,096-T, Order for Authority to Initiate Stockholders' Derivative Action against Doeskin Products, Inc. and Others, S. D. California, Oct. 14, 1960.

2. Since the forepart of the year 1957 Equitable Plan Company has been a stockholder in defendant Doeskin Products, Inc., organized under the laws of New York.

3. In September, 1957, Lowell M. Birrell, who was then Chairman of the Board of Doeskin Products, Inc. and in complete control of the corporation, caused it to issue in the name of Jose M. Capmany ten certificates numbered NU-2101 to NU-2110, each for one hundred thousand shares, and seven certificates, numbered NU-2111 to NU-2117, each for ten thousand shares, or a total of one million seventy thousand shares of the corporation's authorized common stock, and caused the certificates to be endorsed in blank with the name Jose M. Capmany and delivered to Birrell.

4. As a part of the same transaction Birrell caused it to appear that the 1,070,-000 shares had been sold by Doeskin for $2,140,000 to Capmany's pretended principal, a phantom Panamanian corporation called Darien, Campania de Inversiones y Finanzas.

5. The purported issuance and endorsement of the certificates in Capmany's name and their pretended sale to Darien was known and intended to be a fraudulent operation from which Doeskin would and did receive nothing, but which would and did for a long time enable Birrell to continue his control of the corporation.

6. Aside from the entries on Doeskin's records falsely reciting that the 1,-070,000 shares had been sold for $2,140,-000 and the proceeds lent to Doeskin's, wholly-owned subsidiary Keta Gas & Oil Company, the pretended evidence that Doeskin had received consideration for the shares appears to have consisted of a record or a purported transcript of a record of entries in the accounts of Banco de Financiero at Havana, Cuba, one reciting that $2,140,000 had been deposited to Doeskin's credit, followed by another reciting the transfer of the same sum from Doeskin's account to that of Keta Gas & Oil Company, the latter entry being followed by another reciting the transfer of the identical sum from Keta to its subsidiary Cubanda, whence the insubstantial credit vanished altogether.

7. No defendant has claimed in this action (nor is it the fact) that Doeskin ever received anything whatever for the one million and seventy thousand shares, nor has any of the defendants ever disputed in this court that the transaction was wholly larcenous, or that the certificates remained in Birrell's possession until he disposed of them in the manner hereinafter described.

8. Seventy thousand of the shares evidenced by the seven certificates numbered NU-2111 to NU-2117, were temporarily used by Birrell as collateral in an

account that he and Workman maintained with a Canadian brokerage house. On December 31, 1957, Birrell transferred them to Doeskin for $100,000, which Doeskin paid to him. Those shares are held in Doeskin's treasury and are not affected by this proceeding.

9. The remaining certificates numbered NU-2101 to NU-2110, for one million shares, became the subject of a series of fraudulent transactions in Cuba, Canada and Switzerland contrived to create the appearance that they had been transferred to a bona fide purchaser.

10. Early in February 1958 Workman, widely known to be one of Birrell's Montreal associates, approached Smiley, a Montreal lawyer, with the information that a lot of one million shares of Doeskin stock, issued when the company was under Birrell's domination, was available in Cuba for acquisition on attractive terms, but that Workman's reputation, earned in part through his association with Birrell, precluded him from becoming a recognized participant in any transaction relating to the stock. Workman indicated that Smiley himself would not have to put up any money in order to become the holder of the stock, but would have a lucrative position in the Doeskin organization and would obtain financial assistance from others. Workman also approached Schnider, a Montreal business man of limited experience, and within a few days after Workman had first mentioned the subject to Smiley, the three of them, together with Leznoff, a Montreal accountant associated with Birrell, took a plane to Havana, where they met with Birrell. It was arranged at Birrell's direction that the four Canadians should organize Charles Holdings, Inc., a Quebec corporation, in which Smiley and Schnider should be the nominal shareholders, and that when the corporation had been organized there should be a further meeting with Birrell in Havana to complete the transfer of the Doeskin shares.

11. On his return to Montreal, Smiley got in touch with Tabah, a man of considerable experience in business and finance, with whom Smiley had been on cordial terms for many years. Smiley told Tabah about the opportunity presented to him by Workman, mentioning Birrell also, and making clear to Tabah that money would be required later to complete the transaction. Tabah asked questions, obtained documentary material relating to Doeskin, and promised that Smiley could count on him. Tabah contends, however, that he did not firmly commit himself at that point, but told Smiley that he would not be free to take part until about the end of the year and would give further consideration to the matter at that time.

12. Smiley attended to the incorporation of Charles Holdings, Inc., the shares of which were issued to him and Schnider, both of whom endorsed their certificates in blank and delivered them to Leznoff, who has continued to hold them.

13. As soon as those matters had been done, Workman, Leznoff, Smiley and Schnider rejoined Birrell in Havana, where two purported contracts dated February 17, 1958, were prepared and executed. The first, between Darien and Charles, recited that the one million shares of Doeskin stock represented by the ten certificates numbered NU-2101 to NU-2110 were sold by Darien to Charles for $1,000,000, $30,000 down and the balance in installments, evidenced by a series of promissory notes, the last of which was payable on March 1, 1962. It was provided that Charles should have no right to sell or otherwise dispose of any of the stock until the stipulated purchase price had been fully paid and that all of the shares might be reclaimed by Darien if punctual payment of the notes should not be made in full. The second contract, among Darien, Charles and Leznoff, provided that Leznoff should hold the certificates in escrow until Charles had paid $170,000 in addition to the $30,000 purportedly paid on the execution of the first contract. Thereupon the certificates should be delivered to Charles, but in the event of any subsequent default on the part of Charles, should be returned to Leznoff and by him to Darien. Birrell

delivered to Leznoff the ten certificates of Doeskin stock and Leznoff subsequently delivered the same to Workman.

14. While the purported contracts were in course of preparation, Birrell convened a meeting of the Doeskin directors, at which the resignations of two directors were accepted and Smiley and Schnider were elected in their stead, Smiley then being chosen to be Chairman of the Board and Schnider elected Vice President of the corporation. Birrell directed that Leznoff should be employed by Doeskin as a financial consultant, that Workman should be the intermediary between Birrell and the officers of the corporation, and that various actions should be taken by Smiley in accordance with memoranda which Birrell dictated and delivered to him.

15. Smiley and Schnider were not and do not now pretend that they were in any way deceived by the purported contracts or by any other detail of their transaction with Birrell, Workman and Leznoff. Confessedly they parted with no consideration, knew that Birrell had stolen the certificates from Doeskin and that they were engaging in a fraudulent transaction designed to create the appearance that they were the proprietors of Charles and that Charles was a bona fide purchaser of the certificates.

16. From the time of their installation as officers and directors, Smiley and Schnider, taking their directions from Workman, attended to operating the corporation in accordance with Birrell's instructions.

17. After their discussions in February 1958, Smiley and Tabah had further conversations on the subject of the latter's participation in the Doeskin adventure, and serious negotiations took place between them over a period of at least several months prior to December, 1958.

18. It appears that prior to December 19, 1958, Tabah had full information of the material circumstances attending the issuance of the 1,070,000 shares of Doeskin stock and the transfer of 1,000,000 of those shares to Charles. He knew that two actions against the corporation were pending in the Supreme Court of New York, both challenging the validity of the shares, and that the New York office of the Securities and Exchange Commission had written to Smiley and to the corporation in April, 1958, warning that none of the shares should be transferred without providing the purchaser with full information respecting the attacks on their validity.

19. On December 19, 1958, or subsequently, having learned that one of the two actions contesting the validity of the 1,000,000 shares had been dismissed (Matter of Doeskin Products, Inc., 7 A.D. 2d 42, 180 N.Y.S.2d 760), and having been advised that the other pending action (Weinberger v. Bradley, Sup., 210 N.Y.S. 2d 658) offered no serious threat to Charles' title to the shares, Tabah, in behalf of his family-owned company, Pan American Investment Corporation, entered into a contract dated December 16, 1958, with Charles, Smiley and Schnider for the purchase from Charles of 200,000 of the 1,000,000 shares of Doeskin stock.

20. The contents of the contract dated December 16, 1958, were agreed upon in meetings in Montreal among Workman, Kurlander, Smiley, Schnider and Tabah, after Tabah had refused to become a stockholder in Charles, as had been contemplated in his previous negotiations with Smiley.

21. The contract provided for the payment by Pan American to Charles of $183,000, of which $58,000 was payable on the execution of the contract, $75,000 by May 15, 1959, and $50,000 by June 15, 1959. It was a condition of the contract that Doeskin should contract to employ Tabah in a managerial position for a period of five years from January 1, 1959, at a salary of $1,500 per month payable to Pan American and a monthly allowance of $1,500 for Tabah's personal expenses, the division being made, as Tabah explained, for income tax reasons. It was further provided none of the 1,-000,000 shares should be sold or pledged except by unanimous consent and should be voted in one block for the election of

Doeskin Directors, one of whom should be designated by Pan American. It was expressly recognized that Tabah's services to Doeskin were to be limited to such as he might choose to perform.

22. Before executing the contract dated December 16, 1958, the document actually having been executed no earlier than December 19, 1958, Tabah ascertained that Doeskin's Board of Directors had authorized his employment by the corporation on the terms mentioned.

23. On December 19, 1958, Tabah delivered to Smiley the check of Pan American Investment Corporation drawn to Smiley's order for $58,000.

24. After January 1, 1959, when he assumed the presidency of Doeskin, until this court's appointment of the fiscal agents in November 1960, Tabah obtained from Doeskin considerably more than his specified salary and allowance, and he now admits that he participated with Workman in various allegedly fraudulent practices which are the subject of plaintiff's second claim herein. (Trial of plaintiff's second claim has not yet commenced; the subject of that claim is relevant here only to the extent that Tabah's recent admissions of participation in the allegedly fraudulent practices reflect upon the credibility of his asserted defense to the first claim.)

25. On the basis of the record now before me, Tabah's contention that the contract between Pan American and Charles dated Dec. 16, 1958 was entered into in good faith on his part, without notice of any wrongdoing on the part of Birrell, Smiley, Schnider, Workman or Charles, is incredible, as is Tabah's testimony that he did not learn until late in 1959 that the certificates had been fraudulently issued. If, at the time he executed the contract, Tabah lacked knowledge of any of the particulars regarding the history of the shares, such lack of knowledge was the product of his deliberate choice to remain ignorant of what further reasonable inquiry on his part would certainly reveal.

26. Tabah's behavior late in 1959, after the time when he admits that the full measure of the fraud became known to him, was not the behavior of an innocent victim of deception. He not only continued to participate with his alleged deceivers in the dishonest management of the corporation,—participation for which he claims excuse on the ground that he was obliged to protect his investment, but he also joined forces with his alleged deceivers in opposing the present plaintiff's efforts to uncover the truth in the Weinberger action. In addition, as he now admits, Tabah deliberately submitted false and misleading affidavits to this court in opposition to plaintiff's applications for a receivership and other interim relief.

27. It was the ostensible object of the Weinberger action to cancel the fraudulently issued shares. However, it is now plain and uncontradicted that the defendants contrived to exploit that proceeding as a device to obtain confirmation of the Birrell-Workman scheme.

28. The proposed settlement, which was espoused by the plaintiffs as well as the defendants in Weinberger, involved the surrender of one-quarter of the million shares in exchange for secure title to the remaining three-quarters. In their testimony here, Smiley, Schnider and Tabah admitted the fraudulent nature of the defense representations which they made in the Weinberger action and they conceded that their purpose in making such representations was to obtain judicial approval for the proposed settlement.

29. Tabah produced three photostats of cancelled checks as proof that he paid in behalf of Pan American a total of $183,000, the sum specified in the contract dated December 16, 1958. He urges that the large amount of his payment demonstrates his good faith in purchasing the 200,000 shares. He testified that the shares were selling in the market at that time for about two dollars a share, so that the price he claims to have paid was only a little less than one-half the market price, presumably established by sales in small lots. But the knowledge which Tabah admittedly possessed bear-

ing upon the history of the shares before he made the first asserted payment, on December 19, 1958, is in itself destructive of his contention that he purchased in good faith.

30. Moreover the evidence that Tabah paid $183,000 for the shares is far from convincing. Smiley testified that he cashed the second check for $75,000, and gave the currency to Workman; it does not appear that he treated the third, for $50,000, differently. Any rational conjecture about what Workman did with the money cannot exclude the possibility that some of it came back to Tabah. In any event, Tabah could not shut his eyes to readily discernible facts and rely upon his payments to elevate his company, Pan American, to the status of a good faith purchaser.

31. Defendant Synta Corporation Reg. Trust is a mere corporate shell contrived by Workman with the assistance of Smiley and the probable assistance of attorneys representing Doeskin to create the illusion that 600,000 of the stolen shares had been transferred from Charles to a bona fide holder.

32. The creation of Synta was initiated in June of 1959 when Smiley and I. Z. Nathanson met Workman in Zurich pursuant to his instructions, and the three of them conferred with a Swiss attorney, Max Sandberg. Workman explained to Sandberg that his purpose to effect through a nominee the exchange of 600,000 shares of Doeskin stock for Charles' notes in the face amount of $600,000 executed in favor of Darien in February 1958. Sandberg advised the formation of a Liechtenstein corporation and suggested the name Synta Corporation Reg. Trust. At the same meeting it was arranged that Sandberg should address a letter to Charles reciting that Sandberg had a client interested in acquiring 1,000,000 shares of Doeskin stock, and that Smiley should respond with a letter from Charles that only 600,000 shares were available. Those preliminaries were to be followed by pretended negotiations that would result in the contemplated exchange. The prearranged

correspondence between Sandberg and Smiley was conducted but the Swiss lawyer seemed to be dilatory and in August 1959 Workman dispatched Smiley to Zurich to join Kurlander who had been conferring with Sandberg for some time. Smiley met with Kurlander and Sandberg, and took over in Kurlander's place the matter of assisting Sandberg in completing the proposed contract between Synta and Charles. The desired contract was completed, in French, and was executed by Smiley in Zurich, although Synta had not at that time been incorporated. Smiley returned to Montreal and was seasonably informed by a Montreal bank that it had received the notes from a Swiss Bank to be exchanged for the 600,000 shares of Doeskin stock. Smiley obtained the certificates from Workman and exchanged them for the notes, which he turned over to Workman.

33. The ten certificates totalling 1,000,000 shares of Doeskin stock delivered by Birrell to Leznoff in February 1958 were subsequently delivered by Leznoff to Workman, and except for the two certificates each for 100,000 shares delivered to Tabah, they have remained under Workman's control save as they were temporarily affected by the option hereinafter mentioned.

34. As presently registered, 200,000 shares remain in the name of Jose M. Capmany, 50,000 in the name of Pan American Investment Corporation and 750,000 shares in the name of Albemarle Paper Manufacturing Company. The manner in which the 750,000 shares came to be registered in the name of Albemarle Paper Manufacturing Company is fully explained by the record in the receivership proceeding. On September 2, 1960, while hearings on the proposed settlement of Weinberger's action were in progress, Charles and Pan American gave Albemarle an option to buy the 750,000 shares which would have been validated by a judgment confirming the proposed settlement. In connection with the option, which Albemarle abandoned on becoming informed of the facts, the 750,000

shares were transferred to Albemarle's name and held in escrow. Upon rejecting the option, Albemarle released the certificates without endorsement and executed stock powers restricting the transfer of the certificates subject to a stipulation and order of September 9, 1960, in the Weinberger action.

35. Workman is at present in control of six certificates each for 100,000 shares made out to Albemarle, accompanied by its stock powers in the form described; two similar certificates, each for 75,000 shares, are impounded by order of this court; two certificates in Capmany's name for 100,000 shares each, and one in Pan American's name for 50,000 shares are being held in escrow subject to this court's order.

### Conclusion of Law

From the preceding findings it appears that the described certificates for 1,000,000 of the common stock of Doeskin Products, Inc. were fraudulently issued, that Doeskin received no consideration therefor, and that none of the shares has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful (N.Y. Personal Property Law, § 168).