**Shirley BIVINS et al., Plaintiffs,**

v.

**BOARD OF PUBLIC EDUCATION AND ORPHANAGE FOR BIBB COUNTY et al., Defendants.**

**Civ. A. No. 1926.**

United States District Court
M. D. Georgia,
Macon Division.
Oct. 20, 1967.

Thomas M. Jackson, Macon, Ga., for plaintiffs.

C. Baxter Jones, Macon, Ga., for defendants.

BOOTLE, Chief Judge:

By supplemental complaint the plaintiffs seek to enjoin the construction of a proposed new high school building on Madison Street in the City of Macon. Included among the defendants are, in addition to the Board of Public Education and Orphanage for Bibb County, the Georgia Education Authority (formerly called the State School Building Authority), and the State Board of Education. The alleged grounds for the injunctive

relief sought are that the proposed construction would constitute a violation of this court's order of June 29, 1967, and particularly of the following two paragraphs:

"As set out more particularly in the body of the decree, they [the defendants] shall take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system" (appearing in the introductory portion of the decree),

and

"The defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual system." (Paragraph VII of the decree).

As a factual basis of the alleged violation plaintiffs allege in substance that the proposed high school was originally conceived as a Negro high school, that it has been planned as a Negro high school, that the proposal now is to build it as a Negro high school, and that if it is built it will probably be attended only by Negro students. The defendants do not take serious issue with any of the above stated factual contentions, except only that as to attendance at the school there is the possibility that under the compulsory freedom of choice plan prescribed in the case of the *United States v. Jefferson County Board of Education*, 380 F.2d 385 (5th Cir. 1967), and adopted by this court in the order above referred to, some white students living in the proximity of the proposed school may fail to exercise their compulsory choice and as a result thereof be assigned to the proposed school. The defendants do vigorously contend, however, that all prayers for injunctive relief should be denied for three reasons: first, the said order was intended to be prospective only and should not apply to this proposed school; second, the plans for the construction of this proposed school have so far progressed and so much has been done toward the building of this school

that it should be looked upon as having been already "located" at the proposed site prior to the time of this supplemental complaint, and, third, that the plaintiffs are estopped from complaining with respect to the construction of this school at this site.

An evidentiary hearing has been held, which, with arguments of counsel, consumed three full days. All parties seek an early ruling as to whether or not a preliminary injunction should issue.

After careful consideration this court is of the opinion that the preliminary injunction should be issued, and, while the court does not at this time have the benefit of a transcription of the oral evidence, it will, from memory and notes, briefly outline the facts which lead to this conclusion.

The school is planned to be built on the edge or fringe of a predominantly Negro residential area in the City of Macon known as Pleasant Hill. This area is somewhat amorphous depending upon different concepts as to its exact boundaries. It is bounded generally on the East by Madison Street, on the North by Upper River Road and Neal Avenue, on the West by Rogers Avenue, and on the South by Georgia Avenue and its extension into Hardeman Avenue and into Vineville Avenue. In some places, particularly on Georgia, Hardeman and Vineville Avenues, the fringes of the above described area are inhabited by whites and are not actually included in the concept of Pleasant Hill and as we go westerly Pleasant Hill proper narrows and the fringes widen. Pleasant Hill proper may be looked upon as that area designated upon an Office of Economic Opportunity plat as Target Area No. 1, and which the evidence shows to contain a Negro population of 6,526 and a white population of 261.

The Negro high school students in this general area were formerly, and until about 1949, served by two Negro high schools, Hudson on Ward Street and Ballard on Forest Avenue. These two schools were abandoned about 1949 as being entirely inadequate. The Board,

in 1949, constructed a new Ballard-Hudson Senior High School for Negroes out on Anthony Road, a distance of some 3 miles from the proposed site here involved. Then, in 1958, Appling Senior High School was constructed for Negroes in East Macon in the opposite direction of the City from the proposed site, and a distance of approximately 3 miles therefrom. There followed Ballard-Hudson Junior High School for Negroes in 1965 in the general vicinity as Ballard-Hudson Senior, and in 1967 Appling Junior High School for Negroes was built in the same general vicinity as Appling Senior. The four schools above mentioned are of considerable size and capacity, Ballard-Hudson Senior having 26 acres and a pupil capacity of 1600, Ballard-Hudson Junior having 15 acres and a pupil capacity of 525, Appling Senior having 28.7 acres and a student capacity of 800, and Appling Junior having 40 acres and a student capacity of 510. The above-mentioned locations and acreage figures reflect the trend which the Board has followed for many years now to locate high schools as distinguished from grammar schools in areas where there is sufficient room adequate for instructional purposes and for recreational purposes and for athletic purposes, both for today and for tomorrow. The other high schools all designed originally for white students may be listed here: Lanier Senior, built way back in 1924, has 11 acres and a student capacity of 1,275; Lanier Junior built in 1949 has 23.5 acres and a student capacity of 1,000, the two schools together having 34.5 acres. Lanier's counterpart for girls, Miller Senior, has 8 acres and a student capacity of 775, and Miller Junior has 5 acres and a student capacity of 875. Willingham Senior for boys built in 1958, student capacity 775, and Willingham Junior for boys built in 1966, student capacity 600, have a joint acreage of 25.28, and their counterpart for girls, McEvoy Senior, built in 1957, with capacity of 500, and McEvoy Junior, built in 1965, with capacity of 400 have a joint acreage of 25.28. And

schools, Mark Smith for boys, built in 1965 has an acreage of 17.5 and its counterpart for girls H. S. Lassiter, also built in 1965, also has an acreage of 17.5.

As further recognition of the need for adequate space upon which to construct school buildings it may be mentioned that the Board is now constructing an elementary school on West Anthony Road near Columbus Road with an acreage of 15, another elementary school near the Hartley Bridge Road with an acreage of 15. The Minnie Burghard elementary the most recently constructed high school has recently been completed in the Bloomfield area with an acreage of 15, and with commendable wisdom and foresight the Board has acquired 80 acres out on Wesleyan Drive, a distance of about 5.5 miles from the proposed site involved here for future use probably for a high school or high schools and grammar schools. There has also been acquired in Bloomfield on Jordan Lake Road a 15 acre tract either for a high school or elementary school and an additional tract has been acquired on Upper River Road only one-half mile from the Mark Smith and Lassiter schools.

And yet, it is now proposed to construct a combined Junior and Senior high school for Negroes on Madison Street upon an acreage variously indicated by the evidence as 2.83 acres, or possibly 3.5 acres, or possibly "4 plus". Plaintiffs' Exhibit 5 is a plat dated July 21, 1966 showing a tract of 2.830 acres and which appears to include all, or approximately all, of this proposed site as it fronts on Madison Street including the 35-foot encroachment therein as said property is bounded on the East by Madison Street, on the South by Green Street as it will be widened and the property diminished by the Walnut Street extension, on the North by Williams Lane, and on the West by the "Green Street School." It may be that this plat does not show all of the property on the back side of the lot furthest from Madison Street, which is planned to be devoted to this proposed school. It may be that the defendants plan to

use some portion of the small area lying between the front door of the present Green Street grade school and the property shown on the above-described plat. At most, a very small amount of square footage could be taken away from the Green Street School although in anticipation of such use the Board has acquired the property lying to the rear of the Green Street School lot and between this school lot and Rock Hill Lane, which property according to a tax plat (D–9) introduced in evidence appears to be about one acre, which coupled with the one-acre elongated lot upon which the Green Street School is situate would allow the Green Street School an acreage of only approximately 2 even if the proposed new school does not appreciably encroach in the front yard of the Green Street School. The significance of these acreage figures may be demonstrated by the fact that the minimum standards recommended by the State Department of Education as to acreage is as follows:

"Authorities in the field have developed what are considered minimum standards for site sizes. Many schools will require much larger acreages. For elementary schools, it is suggested that there be provided a minimum site of five acres plus an additional acre for each 100 pupils of predicted ultimate maximum enrollment. For high schools, it is recommended that there be provided a minimum site of ten acres plus an additional acre for each 100 pupils of predicted ultimate maximum enrollment. Although these are desirable minima, a system following these suggestions should plan the full utilization of the recommended spaces." (P–6).

Thus the Green Street School with its original one acre and its capacity of 420 needed a minimum acreage of 9.2. If we leave the Green Street School with the one acre it originally had plus the approximate one acre recently acquired it is still short in acreage 7.2, and should not be encroached upon for the purpose of building a high school at its front door.

Then, applying the above-quoted minimum standards to the proposed new high school we see that since it is designed for a capacity of 600 it should have an acreage of 16 as against the 2.83 shown on the plat, as against the "4 plus" shown on the school site approval letter from the State Board to the Local Board dated February 11, 1966, or as against the figure 3.5 acres, which counsel for plaintiffs in oral argument said that the acreage "might run." While the specific plans are not in evidence, testimony shows that the building in order to accommodate the 600 students will have to be, in part at least, a multi-storied building. The State Department minimum standards also read: "for instance, a baseball field requires approximately four acres of land; a football field, three acres; and a softball diamond, nearly two acres of land." Quite obviously we would expect some explanation on this State Department of Education form expressing its approval, and it is to be found in these words: "Location and description of site: 151 Madison St., Macon, Ga. A rectangular block of land on West side of Madison St. with additional land extending westward from Northwest corner of rear of lot." (A reference to the tax digest plat (D–9) above referred to indicates that this "additional land" must consist of two former residential lots which put together have a dimension of approximately 60 feet by 235 feet), and in the following words: "This site is the only one available in a highly concentrated attendance area consisting of hundreds of multiple dwelling units of the Macon Housing Authority and permanent home owners. Adjacent property has been purchased through condemnation procedure at extreme cost to the Board of Education to increase acreage for school site. (This is the location of the old Negro blind academy which is to be demolished.)" (D–2).

It would seem that the Local Board of Education as well as the State Board of Education must have had some concern from the beginning and doubtless

that concern continues even until today with respect to the small acreage available for this proposed new high school. It would appear from the evidence that the Local Board was moved to the selection of this site in part at least by two considerations. First, they thought the Negroes in this area wanted this high school constructed in the Pleasant Hill area; and, secondly, there was a deadline they had to meet in order to make application for their share for certain State School Building Program funds. Exhibit D-10 contains excerpts from the minutes of a called meeting of the Local Board on May 2, 1966 and shows that the Chairman of the Special School Needs Committee reviewed the need of a high school in the Pleasant Hill area, which he stated was originally discussed some five years previously. He stated further that because of a number of problems the attempt of the Board to find a suitable site in the area had been unsuccessful. He emphasized the even greater need at the time of the meeting, May 2, 1966, of a high school in Pleasant Hill and pointed out that there were some 700 high school students living in the area and attending crowded high schools in other sections of the City. He brought out that two weeks earlier the Local School System had been notified that it was eligible for approximately $1,400,000 as its share of the 1964 State school building program and that it would have until May 9, 1966, (seven more days) to make application for this money and to set up priorities of projects for the expenditure of this amount. He reported further that his Committee felt that a high school in the Pleasant Hill area should be among the top priorities on their application, and said: "the only property in this section that has any possibilities for the school site is the piece of property on which the Amelia Hutchings Memorial Library is now located along with the present playground area of the Green Street Elementary School." He reported further that additional property on Green and Rock Hill Streets would have to be purchased in order to replace the playground for the Green Street School. It thus appears that this deadline for making application was met and this location was set up with a number 2 priority, not because it was recognized by anyone as fully adequate for the purposes intended but, to quote from the above mentioned minutes, because it was "the only property in this section that has any possibilities for the school site."

The Local Board was perhaps misled into thinking that the people in the Pleasant Hill area generally advocated the erection of a Negro high school in that area because during the school year 1963–64 the Assistant Superintendent in discussing the Board's building program at the Organization of Negro Teachers heard the President of that Organization, the Principal of Ballard-Hudson Senior, remark: "We want a high school in Pleasant Hill," which statement was followed by general applause on the part of the teachers present. The Assistant Superintendent reported this experience to the Superintendent and they began a survey to determine the needs and then followed a search for a site. Two other Negro teachers named in the evidence were also actively in favor of the project as doubtless were some others, just how many the evidence does not disclose. The evidence does disclose that the President of the Organization above referred to suggested this site. If the Board really thought that the remark and the applause on the part of the teachers both above-mentioned, plus such other contacts as they may have had with the residents of Pleasant Hill, really expressed any general sentiment and desire on the part of residents of the area, the Board's surprise upon receiving on August 2, 1967 a resolution from the Macon Branch of the N.A.A.C.P. protesting the proposed school and threatening the employment of every legal means available to stop the proposed construction is understandable.

The fact that the Chairman of the Special School Needs Committee in mak-

ing his report to the called meeting above mentioned pointed out that there were then some 700 high school students living in the Pleasant Hill area, has its significance. That report as to the number of high school students living in the area is in line with the other evidence and is consistent with the fact that this proposed high school is to have a capacity of 600 and only 600 after any probable expansion. See State School Site Approval, Exhibit D–2.

■ Certainly this proposed school is not being located with the objective of eradicating the vestiges of the dual school system, and its failure to be so located constitutes a violation or would constitute a violation of Paragraph VII of this court's order. Furthermore, the introductory portion of the order makes it mandatory that the Local Board take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system. The location of the proposed school at the proposed site would not be such affirmative action, but in effect would be the reverse of such affirmative action.

■ Normally, of course, a Court of the United States would have no legitimate concern with the adequacy or inadequacy of a tract of land selected by a local governmental unit or agency upon which to construct a building howsoever small the acreage or howsoever costly the building, but when the inadequacy of the tract is one of the potent factors rendering the proposed construction a violation of a federal court order designed to protect the Constitutional rights of citizens, then the inadequacy of the site becomes a matter of legitimate concern to a United States Court. "It is clear that school construction is a proper matter for judicial consideration. * * * It is also clear that new school construction cannot be used to perpetuate segregation." *Kelley v. Altheimer, Arkansas Public School Dist. No. 22*, 378 F.2d 483, 496 (8th Cir. 1967). See also *Raney et al. v. Board of Education of Gould School District*, 381 F.2d 252 (8th Cir. August 9, 1967).

Two other circumstances might be mentioned. The proposed school is named for a former Negro school teacher. Traditionally, such naming has in the past denoted such school as a Negro school, just as the practice in the past of naming a new white school for a former white teacher or white person interested in the cause of education has marked such a school as a white school.

Then too, this proposed school is planned to accommodate both sexes. The practice of the Board is to have for white students separate high schools for girls and boys in both Junior and Senior categories, except as to the Dudley Hughes Vocational School, which is coeducational, and for Negro schools to have only one school to be attended by both sexes. We are not here dealing with the merits or demerits of such a distinction. The Board probably understands that in making this distinction and in following it in the past and presently they have been and are following the wishes of the members of the two different races. The only significance of this practice as it relates to the present case is that inasmuch as this proposed school is planned for attendance by both sexes it is thus by virtue of said practice marked as a Negro school.

■ The evidence shows that thus far no white student has chosen to attend a predominantly Negro school. The evidence, therefore, requires a finding that if this proposed school were constructed according to the present purposes and plans it would be constructed as a Negro school; it would in fact be a Negro school; it would in fact be attended solely by Negro students, except for the possibility of a white student's failure to exercise his compulsory freedom of choice and as a result of such failure being assigned to this school. Moreover, the limited capacity of this school resulting from the entirely inadequate acreage makes it impossible for the school ever to be enlarged so as to accommodate more than the Negro students now living or foreseeable in the area, or to construct thereon an addi-

tional school so as to apply the accustomed separation of students according to sex, as is done in the white schools, or to convert it into separate Junior and Senior High Schools.

It follows, therefore, that the construction of this school must be enjoined preliminarily, unless it could be said that the order of this court above mentioned does not apply to this proposed construction, or unless it could be said that the plaintiffs are in some manner estopped from seeking injunctive relief.

Some chronology may be helpful.

May 17, 1954 *Brown v. Board of Education* was decided by the Supreme Court [347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873].

School year 1963–64 the President of the Negro Teachers Organization suggested a high school in Pleasant Hill.

May 2, 1966 the called meeting of the Local Board above mentioned.

May 3, 1966 Local Board petitioned Mayor and Council to convey to Local Board this proposed site.

May 5, 1966 City deeded site to Local Board.

May 25, 1966 Local Board received commitment letter for $750,000.00 from the Georgia Education Authority.

August 15, 1966 lease agreement entered into by State School Building Authority as lessor and State Board of Education and the Local Board of Education as lessees, under which lessor obligated itself to build the proposed school at the proposed site at an estimated cost of $749,760.00, and to build also two other schools with which we are not presently concerned, and leased all of said schools to lessees for a period of 23 years or until the bonds mentioned in said lease shall have been paid in full or provision duly made therefor, but not to exceed 50 years. The lease contract was conditioned upon the lessor's issuance and sale of bonds covering the construction costs. The agreement binds the lessees to pay certain rentals to the lessor to go into a sinking fund for the payment of said bonds.

August 29, 1966 above-mentioned bonds were validated by an order of the Superior Court of Fulton County, which validation order covered a total of $32,125,000.00, the proceeds of which were to cover many additional constructions other than the three for Bibb County. The petition for the validation of said bonds shows that the rate of interest thereon ranges from a high of 4.50% to a low of 4.20%.

September, 1966 Architect was commissioned to prepare preliminary plans.

September 30, 1966 State Board of Education approved the site.

October 5, 1966 Local Board contracted with Architect.

December 16, 1966 Local Board deeded site to Georgia Education Authority.

December 29, 1966 3-Judge panel decision rendered by Fifth Circuit Court of Appeals in *United States v. Jefferson County Board of Education* [372 F.2d 836].

March 29, 1967 en banc decision in *United States v. Jefferson County Board of Education*.

June 29, 1967 Order of this court adopting the *Jefferson County* decree for this district.

July 13, 1967 Architect's final plans and specifications accepted by Local Board and forwarded to Georgia Education Authority.

August 1, 1967 Local Branch of N.A.A.C.P. forwarded to Local Board copy of resolution protesting proposed site and threatening legal action.

August 16, 1967 Georgia Education Authority advertised for bids.

September 21, 1967 bids opened.

September 26, 1967 this supplemental complaint filed.

October 29, 1967 the expiration of the 35 days from the opening of the bids within which time a contract would

be normally issued to Taylor Construction Company, the low bidder on this proposed construction.

■ A mere statement of the developments in this case as above is deemed sufficient to show both that the order of this court of June 29, 1967 is applicable to this proposed construction, and that it is not too late for the issuance of a preliminary injunction. All activities in connection with this project prior to the filing of this supplemental complaint on September 26, 1967 were preliminary in nature providing for the selection and approval of the site, the preparation and approval of the building plans, and an arrangement for financing. No construction contract has as yet been signed. It is not too late to enjoin preliminarily the expenditure of approximately three-quarters of a million dollars for the construction of a building upon a site so entirely inadequate for the purposes intended, when the construction of such building would constitute a violation of the Constitutional rights of the plaintiffs as enunciated in the *Jefferson County* decree and heretofore made applicable to this case by this court's order. By and large the expenditures heretofore made will not necessarily represent a loss. These expenditures were itemized as follows:

| | |
|---|---|
| Engineering | $610.00 |
| Consultant Engineer | $799.50 |
| Architects' fees (paid by Georgia Education Authority) | $22,491.00 |
| Purchase price of the site | $50,000.00 |
| Grading and demolition | $12,729.50 |
| Engineering | $ 1,738.97 |
| Legal fees not yet ascertained | |
| Purchase of the strip in the rear of Green Street School | $45,500.00 |

The $95,500.00 paid for land by no means necessarily represents a loss. If this particular site was worth $50,000.00 for the purposes intended, and there is no indication that it was not, then in all probability it is worth in excess of that sum for some other purpose. The demolition and grading item may well constitute an improvement to the property. The $45,500.00 paid may prove to be money well spent to supply deficit acreage for Green Street Elementary School. Nor does it necessarily follow that the sum paid to the architects is a total loss. These plans may or may not be useable in whole or in part on some other site.

This court is not called upon at this time to attempt to unravel the prospective leasing, or the prospective financing arrangements heretofore made, but it may be that if the Education Authority cannot construct the building it will not be entitled to collect the rentals from the State Board of Education or the Local Board. And since the Education Authority has not expended the bond proceeds and presumably has them in hand it may be able to invest them at a higher rate of interest than the bonds call for and make a profit, or, on the other hand, the bonds may or may not be callable or redeemable at the option of the Authority. Evidence was not produced at the hearing with respect to some of these matters.

The defendants contend that the plaintiffs are estopped by reason of a short colloquy between counsel for plaintiffs and counsel for defendants which occurred in a hearing before this court on June 23, 1967 when counsel for the plaintiffs was seeking the order which eventuated on June 29, 1967 adopting in this case the *Jefferson County* decree. Counsel for the respective parties then were the same as now. The colloquy relied upon is as follows:

"MR. JONES: I'll ask Mr. Jackson if he is objecting to that location of that school? Do I understand that he is?

"MR. JACKSON: Well, I—personally, or—? Well, I—I don't think it would be proper—No. I wanted to establish for the record that the construction now under way is being built in Pleasant Hill, a Negro neighborhood.

"THE COURT: Well, on the east border of Pleasant Hill, is the record, I believe.

"Mr. JACKSON: Well, I would go further.

"Q. Do you know of any white families living around the area which the school board has chosen as a site for the Madison Street High School?"

The question of the appropriateness of this proposed site was not before the court for decision on June 23, 1967. Nor was Mr. Jackson employed at that time or authorized to speak at that time for his clients with respect to the appropriateness or legality of this proposed site. The litigation then being pressed by the plaintiffs and opposed by the defendants involved the question whether the *Jefferson County* decree should be made applicable to the defendants. It appears from Mr. Jackson's testimony in this case that as of June 23, 1967 he was not even fully familiar with the facts as they relate to this proposed construction. At any rate, if the defendants were inclined as of June 23, 1967 by the above-quoted colloquy to think that there would be no objection on the part of the plaintiffs to this proposed construction, such inclination must have been short-lived, because on August 2, 1967 the Local Board of Education received from the Macon Branch of the N.A.A.C.P. a resolution, referred to above, and which reads as follows:

"WHEREAS Bibb County Board of Education has selected a site adjacent to the Green Street Elementary School (a Negro school) and is about to commence construction of a high school presently referred to as the Madison Street High, and

"WHEREAS this action by the school board clearly indicates that it will locate and build a school knowing that such school will in fact serve Negroes only, and

"WHEREAS the school board is under a Federal Court order to plan all future school constructions, having as an objective, the eradication of all vestiges of a dual or segregated school system and where as we are interested members of the class on whose behalf the Federal suit was instituted,

"NOW, THEREFORE, we resolve to forcefully bring our concern to the attention of said school board and employ every legal means available to stop further school construction which would tend to perpetuate past practices of dualism and segregation in the Bibb County school system.

"The Macon Branch of the NAACP

"Walter E. Davis, Acting President"

The resolution was referred by the Board to its counsel who replied promptly on August 2, 1967 advising that while he had no authority to speak for the Board he advanced certain observations in which he thought the N.A.A.C.P. would be interested. These observations included a reference to the colloquy between himself and plaintiffs' counsel above referred to, the fact that this particular site had been selected at the urging and approval of the Negro community who were interested in having a school built at this site, that he could not identify all of the members of the Negro community who had participated in the discussion, that the Local Board had expended certain funds and had committed itself and others, and that under the compulsory choice program both white and Negro children would be required to choose the school which they wish to attend and expressed the hope that the N.A.A.C.P. would not attempt to obstruct the program. To that letter the President of the Macon Branch of the N.A.A.C.P. replied to the effect that his Organization was objecting because they thought the location would increase segregation and specifically requested a meeting between the Board and N.A.A.C.P. to attempt to resolve the differences, if possible, and stated that the proposed meeting should be held at the earliest opportunity and before construction starts. On August 14, defendants' counsel replied in effect that he would take the matter up with the President of the Board immediately and see if such

a meeting could be arranged. The evidence shows that the matter ended there.

During the trial counsel for defendants suggested the possibility that the Local Board might, after further study and consideration, decide, if permitted to do so, to construct this proposed building and devote the same to some use other than a high school, for instance, as an adjunct of the Dudley-Hughes Vocational School somewhat in the manner in which the Powers and Whittle Schools, formerly elementary schools, are now being used, as pre-vocational or perhaps as Junior High Schools, these two schools as well as Dudley-Hughes Vocational being operated upon a non-segregated basis and being used both for boys and girls. Counsel made it clear, however, that he had no authority to speak for the Board in this connection and that obviously it would take some time for the Board to look carefully into such possibility. The court then called a recess to give counsel for both sides an opportunity to explore between themselves said suggestion and to discuss any other matters which they might wish to talk about. At the conclusion of that conference counsel for the plaintiffs stated that in view of the vagueness and indefiniteness of the suggestion and the lack of anything tangible the plaintiffs desired the hearing to proceed.

Even some of the dissenters in en banc *Jefferson* make it clear that "the objective must be * * * that there be no white schools—no Negro schools—just schools." 380 F.2d 385, 411.

A preliminary injunction will be issued enjoining preliminarily the construction of the proposed building upon the proposed site.

 Careful consideration has been given to the request of some of the defendants that should an injunction be granted plaintiffs should be required to indemnify all of the defendants against any loss and damage resulting therefrom. A hurried reading of Rule 65(c), Federal Rules of Civil Procedure might indicate that a bond should be required. That rule reads:

"(c) Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof."

A bond is not required in all cases however. "The district court is vested with wide discretion in the matter of giving security under this Rule, and in certain cases it has been held proper for the court to issue a restraining order or a preliminary injunction without requiring a bond, as where there has been no proof of likelihood of harm or showing of probable loss. * * * Also, no bond or security is required in connection with injunctions issued by the trial court to aid and preserve its jurisdiction over the subject matter involved." Cyc. of Fed.Proc., Third Ed. Vol. 14A (1965) § 73.55. A leading case on this question is *Swift v. Black Panther Oil & Gas Co.*, 244 F. 20 (8th Cir. 1917), where the court, on page 29, said:

"Finally, it is insisted that the decree for the injunction should be reversed, because section 18 of the act of October 15, 1914, entitled 'An act to supplement existing laws against unlawful restraints and monopolies, and for other purposes,' provides:

" 'That, except as otherwise provided in section 16 of this act, no restraining order or interlocutory order of injunction shall issue, except upon the giving of security by the applicant in such sum as the court or judge may deem proper, conditioned upon the payment of such costs and damages as may be incurred or suffered by any party who may be found to have been wrongfully enjoined or restrained

thereby.' 38 Stat. 738, c. 323 (Comp. St.1916, § 1243b).

"And the court below ordered and issued its injunction without compelling the Panther to give any bond, although counsel for Mr. Swift moved the court to require it.

"But the restraining order and injunction in this case were issued by the court below, in lieu of proceedings for contempt of that court, to prevent the impairment and defeat of the just exercise of its undoubted jurisdiction to protect and enforce its lawful orders and to preserve the title made by it under them. The unlawful interference of Mr. Swift with the enforcement of the just orders and the preservation of the lawful titles made by the court below was a contempt of that court, and, if continued, might well have been punished as such. The issue of the injunction was but a milder method of protecting its jurisdiction, orders, and titles from unlawful impairment. There is nothing in section 18 to indicate, and, until that intention is clearly expressed, it cannot be presumed that the Congress intended thereby to limit or condition in any way the power of the federal court by means of its injunction, any more than by means of proceedings for contempt, to preserve and protect its jurisdiction, acts or titles from unlawful impairment or destruction. Section 18, Act Oct. 15, 1914, is, like section 720 of the Revised Statutes, now section 265 of the Judicial Code, inapplicable to injunctions of the federal courts issued for this purpose. Moreover, Mr. Swift has sustained no loss or injury from the absence of the bond, for the condition of it would have been to pay such costs and damages as he would have suffered if he should be found to have been wrongfully enjoined or restrained, and he is found to have been rightfully enjoined and restrained. If now this court were to reverse the order and decree for the injunction, that act would be a futile one, for, in view of the opinions of

the court below and of this court, the former would undoubtedly immediately issue another like injunction. The order and decree for the injunction are not reversible, because no bond was taken."

Thus no bond is required here where the preliminary injunction is issued by the court "to protect and enforce its lawful orders." See aslo *Dealtry v. Posse School,* 100 F.2d 470, 473 (1st Cir. 1938) and 7 Moore, Federal Practice, Par. 65.09, page 1655, Third Edition, (1966).

■■ And it is equally clear that no bond is required where the preliminary injunction frequently referred to as "protective" in nature is issued to preserve the trial court's "jurisdiction over the subject matter involved." Cyc. of Fed.Proc., *supra*; *Guaranty Trust Co. v. Broadway & Seventh Ave. R. Co.,* 43 F.2d 130 (D.C.N.Y.1930); *Magidson v. Duggan,* 180 F.2d 473, 479 (8th Cir. 1950); *Doyne v. Saettele,* 112 F.2d 155, 162 (8th Cir. 1940); *Urbain v. Knapp Brothers Manufacturing Co.,* 217 F.2d 810, 815 (6th Cir. 1954); *Ferguson v. Tabah,* 288 F.2d 665, 675 (2d Cir. 1961); Continental Oil Oil Co. v. *Frontier Refining Company,* 338 F.2d 780 (10th Cir. 1964).

Accordingly, no bond will be required.

### PRELIMINARY INJUNCTION

For reasons stated in memorandum opinion of this date, all of the defendants named in plaintiffs' amended and supplemental motion for further relief who have been properly served, and without limiting the generality of the foregoing, including Bibb County Board of Education and Orphanage for Bibb County, Georgia Education Authority, (formerly known as The State School Building Authority) and The State Board of Education, and the officers, agents, members and employees of all such legal entities, together with all persons acting in concert with any such persons or legal entities, and together with all persons who have, or acquire, notice of this order, are hereby until further order of this court preliminarily en-

joined from continuing or pursuing any construction of any school building on the lot fronting on Madison Street in the City of Macon between Madison Street and the Green Street Grammar School, and from proceeding with the accepting or letting of bids for the construction of any school on said lot, and from taking any further steps looking toward such construction.