**The REPUBLIC OF THE PHILIPPINES, Plaintiff,**

v.

**Ferdinand MARCOS and Imelda Marcos, et al., Defendants.**

**No. 86 Civ. 2294 (PNL).**

United States District Court,
S.D. New York.

Jan. 13, 1987.

James Drew and Associates, Washington, D.C., Center for Constitutional Rights, New York City, for plaintiff; Severina Rivera, Washington, D.C., Morton Stavis, Peter Weiss, Ralph Shapiro, Mahlon F. Perkins, Jr., Ellen M. Fishman, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants Joseph and Ralph Bernstein and New York Land Co.; Michael J. Silverberg, Laurence M. Sands, John Hayes, of counsel.

Bernstein, Carter & Deyo, and Shereff, Friedman, Hoffman & Goodman, New York City, for defendants Canadian Land Co. of America, N.V., Herald Center, Ltd., and Nyland (C F 8) Ltd.; Philip Carter, Andrew Levander, Elliott Dobin, of counsel.

Golenbock, Eiseman, Assor, Bell & Perlmutter, New York City, for Glockhurst Corp., N.V.; David J. Eiseman, of counsel.

## OPINION AND ORDER

LEVAL, District Judge.

Plaintiff, the Republic of the Phillipines, seeks the appointment of a receiver to manage and control the assets of the Canadian Land Company of America, Herald Center, Ltd., Nyland (CF8) Ltd., and Glockhurst Corp., N.V. These essentially one-asset corporations are the respective owners of the Crown Building and the leaseholds in Herald Center, 40 Wall Street, and 200 Madison Avenue. The Crown, Herald, and 40 Wall properties are managed by New York Land Company, in which Joseph Bernstein and his brother Ralph are principals. The building at 200 Madison is managed by George Comfort & Sons, Inc., in which, so far as appears, Bernstein has no interest.

On the earlier application of the Philippines, an injunction was granted, and recently upheld by the Court of Appeals, 806 F.2d 344 (2d Cir.1986), restraining the defendants from transfering or encumbering the property interests, during proceedings here and in the Philippines to determine whether these properties are the fruits of unlawful takings by former President and Mrs. Marcos from the Philippine Republic. Plaintiff claims that mismanagement and diversion of funds and conflict of interest endangers its equity interests. The application as to Nyland and 40 Wall Street was at least in part rendered moot when a receiver was appointed at the instance of Citibank by reason of substantial defaults incurred under a mortgage agreement.[1]

*Discussion*

Plaintiff bears a heavy burden to establish an actual need for a receiver. *See, e.g., SEC v. Republic Nat'l Life Ins. Co.,* 378 F.Supp. 430, 438 (S.D.N.Y.1974). "[T]he appointment of a receiver 'is, like an injunction, an extraordinary remedy, and ought never to be made except in cases of necessity, and upon a clear showing that ... emergency exists, in order to protect the interests of the plaintiff in the property.'" *Wickes v. Belgian American Educational Foundation, Inc.,* 266 F.Supp. 38, 40 (S.D.N.Y.1967) (citations omitted); *accord, Meineke Discount Muffler Shops, Inc. v. Noto,* 603 F.Supp. 443, 444 (E.D.N.Y.1985).[2]

I find that plaintiff has made a clear, convincing showing of need justifying the appointment of a receiver. The most compelling aspect of the need for a receiver is the conflict of interest demonstrated on the part of the Bernsteins. From what has been shown, the court must recognize a very substantial risk that the Bernstein properties have been and will be managed otherwise than in the best interest of the owner-to-be-determined. In addition to the Bernstein conflict, all the properties managed by a Bernstein company have had

---

1. It is not entirely mooted because the receivership may terminate with respect to the mortgage foreclosure action. Accordingly, my ruling on this motion applies to Nyland and 40 Wall Street as well as the other companies and properties.

2. Defendants contend that plaintiff lacks standing to request a court-appointed receiver because it has only contingent claims to the properties. They rely on cases standing for the proposition that a plaintiff at law (e.g. a tort claimant or creditor) cannot have a defendant's assets placed in receivership before her claim is reduced to judgment and her legal remedies exhausted. *E.g., Piambino v. Bailey,* 757 F.2d 1112, 1131 n. 46 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986).

This action, however, is essentially a claim for imposition of a constructive trust or equitable lien over real property. The Court of Appeals held that there was sufficient evidence of illegality to warrant a preliminary injunction under this theory. 806 F.2d at 348–49, 355. Standing is therefore not an issue. *Cf. Amalgamated Consultants, Ltd. v. De Savary,* 85 Civ. 2759 (JFK), slip op. (S.D.N.Y. Oct. 22, 1985) [Available on WESTLAW, DCTU database] (cited by defendants for vacating statutory lis pendens after determining that claim was really one for damages rather than for real property, court also rejected plaintiff's motion for a receiver, but on the different ground that the defendants had "not exhibited a pattern of secreting assets" which would constitute an "emergency").

defaults in mortgage obligations and/or taxes.

I conclude on the basis of these factors that the appointment of a receiver is appropriate and necessary for the preservation and maintenance of the equity values whose ownership is in dispute before the court.

### 1. *The Bernstein Conflict of Interest*

The Crown Building, Herald Center, and 40 Wall Street have been managed by the New York Land Company, whose principals are defendants Joseph and Ralph Bernstein. The Bernsteins have repeatedly obstructed discovery regarding their management of the properties. Joseph Bernstein also asserted his Fifth Amendment privilege against self-incrimination when questioned about Company matters.[3] These facts themselves support adverse inferences about defendants' conduct that go far in justifying the appointment of a receiver. *See United States v. Ianniello*, 646 F.Supp. 1289 (S.D.N.Y.1986).

The Bernsteins' role in the management of the properties is fraught with conflicts of interest. They assert the right to purchase Herald Center and 40 Wall Street, based on an undated "Memorandum of Executory Contract" for each property filed with the New York County Clerk's Office. The Memoranda were signed by Joseph Bernstein and purportedly for the Owner by an employee of the New York Land Company, which Bernstein controls. A law firm in which Joseph Bernstein is a partner also represents the three Owning Companies other than Glockhurst in this action.

A motion has been made for the disqualification of Bernstein's firm by the purported Managing Director or Attorney-in-Fact of the Owning Companies, Karl Peterson. Peterson has also initiated a related action, *Canadian Land v. Bernstein*, 86 Civ. 9087 (PNL) charging the Bernsteins and the entities they control with racketeering, fraud, and breach of their fiduciary duties. Peterson asserts that the Bernstein's have paid themselves exorbitant fees and that Joseph Bernstein, when asked about the defaults, explained that he was keeping a "war chest" of Company monies for future litigation.[4] The Bernsteins have already paid over $600,000 of building revenues to their own law firm and approximately $1 million more for legal fees in connection with their congressional testimony and New York litigation. Contrary to their management agreements with the Owning Companies, the Bernsteins have kept building revenues in accounts of New York Land rather than Owning Company accounts.[5] The Bernsteins also blocked Peterson's access to Owning Company records, which the agreements provide must be accorded the Company.[6]

In defense of their actions, challenged in the Peterson litigation, the Bernsteins assert that these actions were approved by the Marcoses' agent Rolando Gapud. Such authorization has not been demonstrated.

On December 19, however, the Bernstein's brought suit against not only Khashoggi and Peterson, but also the Marcoses and their agents, alleging that the Bernsteins have purchased and are now the rightful owners of the three Owning Companies whose buildings they managed. *Manhattan Land Co. v. Marcos*, 86 Civ. 9729 (PNL). The complaint alleges that the defendants have conspired to defraud the court and the Bernsteins by creating documents falsely suggesting that Khash-

---

**3.** Ferdinand and Imelda Marcos refused on Fifth Amendment grounds to answer any substantive questions at their depositions in *The Republic of the Philippines v. Marcos*, 86 Civ. 3859 (MRP) (C.D.Cal.), an action to recover other properties allegedly purchased with illegally obtained funds.

**4.** The Senior Vice President of New York Land Company asserts that that company has kept no "war chest."

**5.** It appears that New York Land does maintain a segregated account in its own name for each Company.

**6.** Peterson has submitted affidavits and evidence in support of many of these allegations. Because counsel for the Bernsteins has not yet had the opportunity to respond to those submissions, I do not rely on them here. These issues may, however, be relevant to any further litigation on this application.

oggi acquired ownership of the Companies prior to the issuance of the injunction. They allege that Peterson threatened to have Joseph Bernstein killed if he did not cooperate with this scheme. The complaint claims that the Bernsteins purchased all the capital stock of Canadian Land, Herald Center, Ltd., and Nyland on July 31, 1985.

Finally, the Bernstein's allege that Khashoggi and his agents fraudulently caused the transfer to his Triad International Corp. of a $5 million promissory note payable by First Arabian Corp., S.A. to Canadian Land. Peterson contends that he had nothing to do with the transfer and that it may have occurred before issuance of the injunction. The Philippines point out, however, that the Canadian Land balance·sheet as of June 30, 1986 showed the note as a Company asset. The Bernsteins brought suit on behalf of Canadian Land to collect on the note, but were then informed by First Arabian that the note had been transferred pursuant to an undated document signed by defendant Gliceria Tantoco. Though the assignment states that it was transferred "to meet any further funding requests in connection with the properties held by Glockhurst" and Herald Center, Ltd., Joseph Bernstein asserts that none of these funds has been made available to either corporation.

### 2. Defaults

Security Pacific Real Estate & Mortgage Services, Inc. has served a mortgage and loan default notice with respect to the Crown Building for interest payments exceeding $2 million, real estate taxes totalling $1,032,702.11, and sewer and/or water charges totalling $16,216.78. It has served a default notice on Herald Center for interest payments exceeding $1,800,000 and water meter charges and sewer rents of approximately $7,157.79. In addition, various contractors have not been paid and have filed liens against the properties.[7]

Similar defaults with respect to Nyland's leasehold in 40 Wall Street resulted in a foreclosure action by the mortgagee, *The Republic of the Philippines v. Citibank, et al.,* 86 Civ. 9187 (WK), in which the court has already appointed a receiver. The defaults by Herald Center could result in forfeiture of the entire leasehold interest[8] and, pursuant to a cross-collateralization agreement, endanger the equity of Glockhurst in 200 Madison Avenue.

\* \* \*

▮▮▮ Recognizing that some of the above recitations are merely unproved allegations, the undisputed and the clearly demonstrated aspects powerfully justify the appointment of a receiver. Without a receiver appointed to manage, safeguard and maintain the properties, the court can have little confidence that the equity values will not be diminished, diverted or dissipated.[9]

### 3. Glockhurst

▮▮▮ The case for a receiver of the Glockhurst property (200 Madison) is less com-

---

**7.** Defendants contend that there is a shortfall in operating revenues and that the properties must be mortgaged further to pay for ongoing redevelopment. Nonetheless, the records for fiscal year ended June 30, 1986 show a $6 million distribution to Nyland stockholders. The Senior Vice President of New York Land Company states that "[t]his is a mere bookkeeping entry reflecting a reclassification of transactions that date back to 1984. Most of it is a single $5,196,081 loan from Chemical Bank which had been booked June 30, 1985 as a 'Loan Receivable from Stockholders' on the June 30, 1986 statement." Tahbaz aff. ¶ 5. Because of the sufficiency of other evidence to justify appointing a receiver, and because this "reclassific[ation]" is not fully explained by the submissions, I do not make a finding as to whether it violated the

injunction. The evidence is mentioned here since it may be relevant to further litigation.

**8.** The ground lessor has already threatened to terminate the ground lease.

**9.** The Bernsteins contend, as they did in the Citibank foreclosure action, that their management agreements with the Owning Companies cannot be abrogated by the appointment of a receiver to manage the properties. They rely on mortgage foreclosure cases holding that a receiver cannot assume control over unchallenged, nonderivative property interests, *Security Nat'l Bank v. Village Mall at Hillcrest, Inc.,* 79 Misc.2d 1060, 361 N.Y.S.2d 977 (Sup.Ct.Queens Co.1974), or abrogate occupants' rights by requiring additional payments for imputed rent

pelling because it does not involve management by a Bernstein company. Nonetheless, in view of the total composite picture, I find sufficient basis to have the receivership also cover that building. One important factor is that Peterson, who apparently acts on behalf of Khashoggi, purports without opposition to represent Glockhurst. This brings over Glockhurst the cloud of uncertainty raised by the evidence that Khashoggi and his agents transfered to a Khashoggi company a $5 million promissory note that was an asset of Canadian Land. There are substantial indications that this transfer may have been made in violation of this court's injunction. Also, in view of Peterson's assertion of claims on behalf of his principal over the other properties, he might well regard 200 Madison as a source for the offset of claims concerning the other buildings.

Adding substance to that possibility is the fact that there is evidence showing cross-collateralization and cross-financing tying Glockhurst to the other buildings.

Finally, although 200 Madison Avenue has not formally defaulted on obligations, Glockhurst was recently delinquent in paying real estate taxes. Also, because of cross-collateralization, the defaults regarding Herald Center threaten Glockhurst's leasehold in 200 Madison Avenue. Moreover, a lawsuit filed in New York State courts by a tenant charges that 200 Madison Avenue has not been properly maintained. Although Glockhurst denies the allegations, a former Comfort employee lists a number of critical repairs on which, he asserts, Glockhurst has instructed the manager to spend no money.[10] Finally, Comfort's President informed counsel to the Philippines that he had control over the Glockhurst accounts holding building revenues until May 1986, when control was assumed by Karl Peterson and Sami Fadel. The President stated that he no longer knows what happens to the surplus funds.[11]

I find that plaintiff has made a strong showing that its interests in 200 Madison Avenue also will be endangered unless a receiver is appointed to manage Glockhurst assets and accounts (all of which apparently pertain to its leasehold).

*Conclusion*

I conclude that a clear need has been demonstrated for a receiver to manage the buildings and all related assets including all accounts deriving from or related in any way to the operation or the ownership of the buildings.

At an earlier session in connection with the application of Citibank for a receiver for 40 Wall, although there was opposition to the receivership, no opposition was suggested on the identity of Citibank's nominee, Cushman & Wakefield, as a suitable

charges. *Holmes v. Gravenhorst,* 263 N.Y. 148, 188 N.E. 285 (1933); *Prudence Co. v. 160 West Seventy-Third Street Corp.,* 260 N.Y. 205, 183 N.E. 365 (1932). No such rights are involved here and, almost by definition, any receiver displaces the management of a property, whether it be the owner herself or an agent. Moreover, as the *Holmes* court makes clear, the authority of a receiver appointed pursuant to the court's general equity jurisdiction is a different issue, focusing on the need to prevent waste and preserve the premises rather than on rights under a mortgage agreement. *Id.* at 154, 188 N.E. 285.

**10.** According to the tenant's President, Comfort's President stated that Glockhurst had instructed him to spend no money on maintaining the building.

Comfort's President denies saying any such thing. Glockhurst, he asserts, has told him to continue to maintain 200 Madison Avenue as a first-class building. Comfort has spent over $1.4 million on maintenance in 1986 and the President denies that any building regulations have been violated. He also points to the building's 40% appreciation in three years and net operating income above 1983 projections as evidence of Comfort's sound management.

Glockhurst emphasizes that the tenant never made any complaints about the premises and brought suit only after its request to lease additional space was conditionally refused until it paid $85,000 in back rent. Glockhurst claims that its former employee did not resign, but was fired and denied a reference.

**11.** Comfort's President takes issue with the tenant's assertion that Comfort had been "ordered" to turn over building profits directly to Glockhurst. His response that the building profits have always been deposited in Glockhurst's accounts is, however, not inconsistent with the Philippines counsel's information.

**500**

and qualified receiver. Cushman & Wakefield was installed as the receiver of 40 Wall. There would be obvious advantages to having a single receiver for all the properties. If any party has any opposition to the selection of Cushman & Wakefield, or any alternative suggestion as to selection of receiver, it shall be submitted in writing within 48 hours. In addition, the plaintiff shall promptly communicate with Cushman & Wakefield to advise it of this order and to ascertain its willingness to serve.

Plaintiff's motion is accordingly granted. No payments of any kind shall be made without court approval pending the receiver's assumption of control.

SO ORDERED.