852 F.2d 33
 The REPUBLIC OF the PHILIPPINES, Appellee,
v.
NEW YORK LAND CO., Joseph Bernstein, Ralph Bernstein, the
Canadian Land Co. of America, Herald Center Ltd.,
and Nyland (CF8) Ltd., Appellants.
 No. 772, Docket 87-7498.
 United States Court of Appeals,
Second Circuit.
 Argued April 4, 1988.
Decided June 7, 1988.
 
 Michael J. Silverberg, New York City (Lawrence M. Sands, Philips, Nizer, Benjamin, Krim & Ballon, New York City, of counsel), for appellants New York Land Co., Joseph Bernstein, and Ralph Bernstein.
 Philip R. Carter, New York City (Bernstein & Carter, New York City, of counsel), for appellants Canadian Land Co. of America, Herald Center Ltd., and Nyland (CF8) Ltd.
 Jeffrey J. Greenbaum, New York City (Clive S. Cummis, James M. Hirschhorn, Elana L. Gershen, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, P.A., New York City, Severina Rivera, Washington, D.C., Morton Stavis, Center for Constitutional Rights, New York City, of counsel), for appellee.
 Before OAKES and WINTER, Circuit Judges, and CEDARBAUM, District Judge.*
 OAKES, Circuit Judge:
 
 
 1
 This appeal is from two orders ("the 1987 orders") of the United States District Court for the Southern District of New York, Pierre N. Leval, Judge, which granted, in modified form, a request by The Republic of the Philippines ("The Republic") that a court officer be appointed to oversee the management of several New York City properties. The underlying lawsuit, the history of which is explained in some detail in Republic of the Philippines v. Marcos, 806 F.2d 344 (2d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987), and which we will not repeat here, involves The Republic's claim that five New York properties[1] are beneficially owned, at least in part, by Ferdinand and Imelda Marcos, who purchased those properties with money wrongfully extracted from the government of the Philippines. The lawsuit names the Marcoses, several of their associates, the holding companies which own the buildings of record, and the buildings' managers. Our earlier opinion upheld a preliminary injunction issued by Judge Leval in May 1986 ("the 1986 injunction") which barred the defendants from transferring or encumbering the properties. The appellants here are the corporations and individuals who own or manage 40 Wall Street, the Crown Building, and Herald Center. The fourth property, located at 200 Madison Avenue and owned by the Glockhurst Corp., N.V., is also covered by Judge Leval's 1987 orders, but the owners and managers have chosen not to appeal as to it. The fifth property, Lindenmere, is no longer part of this action.[2]
 
 
 2
 A brief overview of this action's progress since our last opinion should be helpful. After Judge Leval had issued the 1986 injunction, but before The Republic filed its motion for an order appointing a receiver to manage the four commercial properties, Citibank filed a complaint on November 18, 1986, to foreclose its mortgage on 40 Wall Street. On April 24, 1987, Judge Whitman Knapp, of the United States District Court for the Southern District of New York, entered a preliminary injunction appointing Cushman & Wakefield, Inc., as receiver for 40 Wall Street. Citibank, N.A. v. Nyland (CF8) Ltd., 86 Civ. 9181 (WK) (S.D.N.Y.), aff'd, 839 F.2d 93 (2d Cir.1988). On November 25, 1986, a suit was filed by Karl Peterson, who claimed on behalf of Adnan Khashoggi to act for the corporations which own 40 Wall Street, the Crown Building, and Herald Center. That suit was assigned to Judge Leval. This complaint charged the Bernsteins and New York Land Co. with seizing control of the corporations from their rightful owners and with mismanaging and looting the properties, and sought declaratory relief and damages. Canadian Land Co. v. Bernstein, 86 Civ. 9087 (PNL) (S.D.N.Y. filed Nov. 25, 1986). Judge Leval issued a temporary restraining order ("TRO") and scheduled a conference to be held on December 2, 1986, to consider Peterson's motion for a preliminary injunction. On that date The Republic moved to consolidate its action with the Canadian Land action, to intervene as of right in that action, and to appoint a receiver for the properties. The Bernstein defendants submitted affidavits in opposition to the motions, but did not request an evidentiary hearing. On January 12 and 13, 1987, after the TRO in the Canadian Land action had expired and before the order of January 13, appointing a receiver, was entered, Joseph Bernstein caused payment of $557,349.11 to be made from the property-owning corporations (the accounts of which were in the name and under the control of New York Land Co.) to New York Land Co. and to his law firm, Bernstein, Carter & Deyo.
 
 
 3
 In Judge Leval's opinion and order of January 13, 1987, Republic of the Philippines v. Marcos, 653 F.Supp. 494 (S.D.N.Y.1987), he found that The Republic had made "a clear, convincing showing of need justifying the appointment of a receiver," id. at 496, based primarily on numerous conflicts of interest inherent in the Bernsteins' management of the properties, the Bernsteins' claim that they had purchased the companies which owned the buildings they managed, and the service of mortgage and loan default notices on all of the buildings. Id. at 496-98. Judge Leval then suggested that Cushman & Wakefield, Inc., be appointed as a receiver for the buildings, subject to its willingness to serve and to alternative suggestions from the parties. Id. at 499-500.
 
 
 4
 After hearing from the parties, Judge Leval modified his original order on April 29, 1987. 86 Civ. 2294 (PNL) (S.D.N.Y. Apr. 29, 1987). Rather than appoint a receiver, Judge Leval left the Bernsteins' management in place, and appointed Cushman & Wakefield to serve as a "Special Property Advisor" to the three buildings, and to 40 Wall Street should the Citibank receivership be terminated. His order specified that the special property advisor would have full access to the accounts, premises, and personnel of the properties, for the purpose of advising the court as to the propriety of all expenditures and other actions involved in the management of the properties. The order further provided that the special property advisor would not take actual or constructive possession of the properties, or title to the properties, and expressly stated that the advisor was not a receiver. The order also included an injunction against expenditures, leases, and contractual arrangements involving the properties without prior court approval.
 
 
 5
 It is important to note that this appeal involves only the 1987 orders; the appellants have not questioned any of the actions taken by the special property advisor or any subsequent order of the district court concerning any particular expenditures or claim for fees, nor have they requested the district court to reconsider the 1986 injunction. Therefore, our analysis is limited to whether the form of relief was proper, whether Judge Leval followed the proper procedures and made the necessary findings to support the orders, and whether the orders constituted a taking of property in violation of due process.
 
 DISCUSSION
 
 6
 On review we must determine whether Judge Leval abused his discretion in ordering the 1987 injunction and appointing the special property advisor. As to the injunction we may refer to Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975) ("the standard of appellate review is simply whether the issuance of the injunction, in light of the applicable standard, constituted an abuse of discretion"), Stormy Clime Ltd. v. ProGroup, Inc., 809 F.2d 971, 973 (2d Cir.1987), and Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir.1961). The standard to be applied in reviewing the appointment of a special property advisor, on the other hand, is not entirely clear. While the appointment of a receiver is an extraordinary remedy, which "should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interests in the property," 12 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2983, at 21 (1973), here the district court's order was far less intrusive. The advisor's role, as noted above, is essentially to monitor the management of the buildings and advise the court. More intrusive is the provision in the 1987 orders which requires that no payments or transfers be made without court approval. That order is subject to the oft-repeated standard set down in Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam), which requires a showing of irreparable harm and either a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." The 1986 injunction concerned the transfer of the properties; this injunction concerns the possible dissipation of the properties. Both are aimed at preserving the property until the true owners can be determined. Judge Leval recognized that the management company lacked meaningful oversight from either legal or beneficial owners, and acted to preserve the property until the true owner could be determined. His findings clearly support the injunctions as issued.
 
 
 7
 In enjoining disbursements without court approval and in appointing the special property advisor, Judge Leval properly relied on our earlier opinion in this case which held, inter alia, that The Republic had shown "sufficient evidence as to all five properties to support the district court's grant of a preliminary injunction based on its findings of irreparable harm and probable ownership by the Marcoses," Republic of the Philippines v. Marcos, 806 F.2d at 352, as well as a showing that the balance of hardships weighed in favor of The Republic. There was nothing presented to the court which would call these conclusions into doubt; instead, the filing of the Canadian Land action, the filing of a lawsuit by the Bernsteins in which they claimed to be the owners of the buildings, Manhattan Land Co. v. Marcos, 86 Civ. 9729 (PNL) (S.D.N.Y. Dec. 19, 1986), and the notices of default served on the various buildings only reinforce the need for protective measures.
 
 
 8
 In light of all these factors, it was appropriate for Judge Leval to appoint the special property advisor. The district court is expected to use the flexibility traditionally associated with equitable remedies, see Lemon v. Kurtzman, 411 U.S. 192, 200-01, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973); Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944) ("[f]lexibility rather than rigidity has distinguished" equitable remedies), and its broad discretion means our review is "correspondingly narrow." Lemon v. Kurtzman, 411 U.S. at 200, 93 S.Ct. at 1469. Although there are few cases where a "special fiscal agent" has been utilized, see Roach v. Margulies, 42 N.J.Super. 243, 246, 126 A.2d 45, 47 (App.Div.1956), Judge Leval's order accomplished clearly necessary oversight in a manner which is no more intrusive than necessary. Cf. Ferguson v. Tabah, 288 F.2d at 674-75. While the term "special property advisor" does not often appear in our decisions, we have implicitly approved the appointment of a "Special Fiscal Agent" to examine the records of a brokerage firm and make a report to the court, SEC v. Alan F. Hughes, Inc., 461 F.2d 974, 982-84 (2d Cir.1972) (special fiscal agent's report basis for upholding appointment of receiver), and have frequently approved the use of "special masters" in situations where close supervision, but not a shift of control, was deemed necessary.[3] See, e.g., EEOC v. Local 638, 532 F.2d 821, 829 (2d Cir.1976) ("administrator" appointed under Title VII to remedy past discrimination and to develop union affirmative action plan); Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12, 25 (2d Cir.1971) (appointment of "federal monitors" to prevent brutality by prison guards); Powell v. Ward, 487 F.Supp. 917, 935 (S.D.N.Y.1980) (designated "special master" to oversee compliance with prison reform injunction), aff'd and modified on other grounds, 643 F.2d 924 (2d Cir.) (per curiam), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). See also Whitman v. Fuqua, 549 F.Supp. 315, 326 (W.D.Pa.1982) (appointment of federal magistrate to oversee company's ongoing business); Fed.R.Civ.P. 53; cf. Fed.R.Civ.P. 66; 16 W. Fletcher, Cyclopedia of the Law of Private Corporations Secs. 7671, 7675, at 31-35, 44-47 (rev. perm. ed. 1979).
 
 
 9
 Here Judge Leval's solution to the problem accounted for all the identifiable private interests at stake, preserved the property until such time as a final solution may be reached, and allowed the properties to continue to function. While changing conditions, or particular orders by the district court under the injunction, may require reconsideration, at present we have only praise for Judge Leval's handling of the situation.
 
 
 10
 Appellants also claim that there should have been an evidentiary hearing before the order was issued. However, our record indicates that while they had the opportunity, they never asked for such a hearing. We recently held that "[o]n a motion for preliminary injunction, where 'essential facts are in dispute, there must be a hearing ... and appropriate findings of fact must be made.' " Fengler v. Numismatic Americana, Inc., 832 F.2d 745, 747 (2d Cir.1987) (quoting Visual Sciences, Inc. v. Integrated Communications, Inc., 660 F.2d 56, 58 (2d Cir.1981)). In Fengler, it was clear that "essential facts" were disputed. Here, however, the uncertainty of ownership, the defaults, the lack of cooperation with discovery, and other questionable conduct by the Bernsteins either had been clearly demonstrated in the prior stages of this case or not controverted by the defendants. It is not a rigid requirement that oral testimony be taken on a motion for a preliminary injunction, Redac Project 6426, Inc. v. Allstate Ins. Co., 402 F.2d 789, 790 (2d Cir.1968), and here the prior hearings and affidavits, and the court's findings supporting the earlier injunction, provided an adequate basis for the court's decision. The most significant factors, i.e., the confusion over ownership and the prior defaults, would have remained essentially unchanged by any additional evidence.
 
 
 11
 The Bernsteins' claim that Judge Leval's orders failed to satisfy Rules 52(a) and 65(d) of the Federal Rules of Civil Procedure also lacks merit. These rules require a district court to set forth the findings of fact and conclusions of law which support its order and to provide its reasons for issuing an injunction. The purpose of these rules is two-fold: to aid the trial court by requiring it to marshal the evidence before it and, more importantly, to aid us in our review. See Fengler, 832 F.2d at 748; 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2571, at 679-80 (1971). The two orders here, read together and in light of our decision when this case came up on the appeal from the grant of a preliminary injunction, clearly satisfy these standards.
 
 
 12
 Nor did the district court's decision constitute a "taking" of property without notice and opportunity for a hearing. See Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). The appellants received ample notice, and the opportunity to argue and present evidence. In fact, Judge Leval's willingness to modify his January 13 order at the appellants' request is clear evidence that their arguments received due consideration. Moreover, appellants have not even been divested of possession.
 
 
 13
 Judgment affirmed.
 
 
 
 *
 Hon. Miriam Goldman Cedarbaum of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The five properties include the following:
 (1) 40 Wall Street, a 71-story office building owned by Nyland (CF8) Ltd., a Netherlands Antilles corporation which in turn is owned by three Panamanian corporations that issued "bearer" shares to unknown persons.
 (2) The Crown Building, previously the Genesco Building, at 57th Street and Fifth Avenue, owned by The Canadian Land Co. of America, formerly a Netherlands Antilles corporation called Lastura Corp., which in turn is owned by three other Panamanian corporations that also issued "bearer" shares.
 (3) Herald Center, previously the Korvette Building, at Sixth Avenue and 34th Street, which is owned by Herald Center Ltd., formerly Voloby Ltd., a British Virgin Islands corporation. Herald Center Ltd. is owned by three other Panamanian corporations, again issuers of "bearer" shares.
 (The above three properties have been managed by the appellants Joseph and Ralph Bernstein.)
 (4) 200 Madison Avenue, at the southwest corner of 36th Street and Madison Avenue, which is owned by Glockhurst Corp., N.V., which in turn is owned by the same three Panamanian corporations that own Herald Center Ltd.
 (5) Lindenmere, an estate in Suffolk County, Long Island, in the town of Brookhaven, Center Moriches, Long Island. Lindenmere was originally purchased by Luna 7 Corp., which was owned by several Filipinos, and was later conveyed to Ancor Holdings, N.V., a Netherlands Antilles corporation. Beneficial ownership is claimed by defendant Antonio Floirendo, a Philippine businessman and close associate of Ferdinand and Imelda Marcos.
 
 
 [2]
 In a consent decree entered July 31, 1987, defendant Antonio Floirendo admitted that the estate had been held by Ancor Holdings, N.V., in constructive trust for the benefit of The Republic of the Philippines, and the property was transferred to The Republic
 
 
 [3]
 Our use of a special master to oversee corporate operations extends back at least over a century to the epic struggle over the control of the Erie Railroad among Jim Fiske, Jay Gould, and Cornelius Vanderbilt and others. In Erie Ry. v. Heath, 8 F.Cas. 761 (C.C.S.D.N.Y.1871) (No. 4,513), the circuit court held Jay Gould, president of the Erie Railway Co., in contempt for refusing to turn over certain books and documents to a court-appointed master. There Judge Blatchford, after noting the basis for the appointment of the master and the extent of the master's authority, noted that
 [i]n executing, under the order made by the court, and the rules which govern the court, the power of calling for books and documents, the master will, of course, see to it that as little inconvenience as possible is caused to the company in the way of interrupting its business, or the use by it of the books needed for the investigation.
 Id. Judge Leval's order strikes us as applying similar restraint.